**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-01614-CMA-MJW

ALFONSO AVENDANO, on behalf of himself and others similarly situated,

     Plaintiff,

v.

AVERUS, INC., and
MICHAEL SHANK,

     Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO CERTIFY CLASS OF DENVER BRANCH SERVICE TECHNICIANS UNDER FAIR LABOR STANDARDS ACT, EQUITABLY TOLL THE STATUTE OF LIMITATIONS, AND APPROVE NOTICE**

---

     This wage-and-hour lawsuit is before the Court on Plaintiff's Motion to Certify Class Under Fair Labor Standards Act, Pursuant to 29 U.S.C. 216(b); Equitably Toll the FLSA Statute of Limitations; and Approve Notice (Doc. # 16.)  As set forth below, the Motion is granted in part and denied in part.

## I.  BACKGROUND[1]

     The Fair Labor Standards Act ("FLSA") requires that non-exempt employees be paid overtime compensation for time worked in excess of 40 hours in one work week. 29 U.S.C. § 207(a).  The minimum rate of compensation that an employer must pay a

---

[1] The following facts are based on the allegations in Plaintiff's Complaint, as supplemented by certain evidence submitted by Plaintiff.  Specific disputes that are material to the instant Motion are noted.

non-exempt employee for overtime work is one-and-one-half times the employee's hourly rate.  29 U.S.C. § 207(a)(1).

Plaintiff, Alfonso Avendano, was a non-exempt hourly employee and worked as a "Lead Service Technician" (also known as a "Driver") for the Denver branch of Averus, Inc. ("Averus").  Throughout his tenure with Averus, Plaintiff drove with a "Service Technician" (also known as a "Helper") in his employer-issued van.  (Doc. # 41-1 at 3.) The van was outfitted with professional cleaning equipment and cleaning supplies – specifically, a large diesel heater and water pump bolted in the back, immediately behind the front seats.  (*Id.* at ¶ 4.)  The two-person Driver and Helper team would attach hoses to this equipment and use the hoses to spray heated, pressurized cleaning fluid onto oven hood and vent exhaust systems at restaurants and other job sites, in both Colorado and neighboring states.  (*Id.*)  Plaintiff was classified as a "non-exempt" employee and paid $10.00 an hour on an hourly basis.  (Doc. # 34-2 at ¶ 5.)  He was directly supervised by Michael Shank, the Branch Manager of Averus' Denver location. (*Id.*)

Averus provides kitchen exhaust cleaning services as well as fire protection maintenance services to restaurants, bars, and hotels.  (Doc. # 34-1 at ¶ 5.)  The company has three operational divisions: Kitchen Exhaust Cleaning, Fire Protection, and Filter Cleaning.  (*Id.* at ¶ 6.)  Averus' corporate office is located in Gurnee, IL, and the company has six branch offices in five states (Denver, CO; Indianapolis, IN; St. Paul, MN; Kansas City, MO; St. Louis, MO; and Nashville, TN).  (*Id.*)  It currently employs a total of 135 full-time employees, including at its corporate offices in Gurnee,

IL.  (*Id.* at ¶ 7.)  Specifically, Averus currently employs eight full-time Drivers and Helpers at its Denver Branch,[2] and 64 Lead Service Technicians and Service Technicians at its other branches.  (*Id.* at ¶ 11.)  The six branches each have different branch managers, who are "provided with company policies and guidelines to enforce . . . [but] given discretion with how to apply policies and forms used."  (*Id.* at ¶ 10.)

Plaintiff filed this action in June of 2014, alleging that Averus violated the FLSA because Plaintiff and similarly situated employees "frequently worked more than 40 hours a week, but were not paid for all of the hours they worked and were not paid overtime for hours worked in excess of 40 in a week." (Doc. # 1 at ¶ 16.)

## A.  AVERUS' COMPENSATION POLICIES

After picking up his Helper, Plaintiff typically drove directly from his home in his Averus-issued van to his first assigned job site.  (Doc. # 41-1 at ¶ 10) ("Almost every day I worked for Averus I would leave my house in the evening driving a work van owned by Averus.  I would pick up my helper and then drive to our first customer location.  The only time I did not leave my house at the start of a work day was when my Helper and I were on a long trip and we had to spend the night out of town.")

At some job sites, Plaintiff had to check in using an automated call-in system, called the "Interactive Voice Recognition" ("IVR") system.  (Doc. # 16-1 at 5, 7.) According to Defendant, some of Averus' customers required that Averus employees call a toll-free number to "check in," both when they arrived at and left a job site, to confirm that they performed work at the customer's location.  (Doc. # 34-1 at ¶ 28.)  The

---

[2] At the time of Plaintiff's employment, Defendants employed between 8 and 14 Drivers and Helpers at the Denver branch.  (Doc. # 16-1 at ¶ 13.)

IVR instructions indicate that "If you do not check out, the IVR system automatically returns the order to open status (it does not recognize that you were there).  Failure to check out will result in no payment for the service performed.  (You must check out every time you visit, NOT just when the job is complete.)"  (Doc. # 16-1 at 5, 7.)

At the end of a shift, Plaintiff and his Helper drove back to Averus' Denver branch, at which point they would return their completed work orders, pick up their work orders for the following day, and reload the van with any spare parts for the cleaning equipment and necessary supplies (e.g., cleaning chemicals, plastic bags, and rags).  (Doc. # 41-1 at ¶ 11.)  Plaintiff alleges that Defendant Shank told him "it was company policy that both Helpers and Drivers return to the Averus' [sic] Denver branch every morning for these job duties.  It would also have been impossible to perform our cleaning duties without returning to Averus' Denver branch each day.  We needed the supplies, spare parts, and work orders to perform our work the next day."  (*Id.* at ¶ 12.) After picking up supplies and work orders, Plaintiff would drive his Helper and himself home in the work van.  (*Id.* at ¶ 17.)

Plaintiff alleges that he "normally worked Sunday through Thursday, 12-15 hours per day, but was never paid anything for hours worked in excess of 40 per week.  I actually worked 60-75 hours per week.  Sometimes I had to work on Fridays and was not paid anything for that work."  (Doc. # 16-1 at ¶ 4.)  Additionally, he alleges that he was told, by Defendant Shank, "that it was Averus' policy to only pay Drivers and Helpers for 40 hours of work per week regardless of how many hours were worked." (Doc. # 41-1 at ¶ 6.)   Additionally, Plaintiff alleges that "[o]ther than Michael Shank

telling me it was Averus' policy, I also know the other two-man Driver-Helper cleaning crews were only getting paid for 40 hours a week when they worked more than 40 hours per week because on some larger jobs more than one van with a Driver-Helper crew would have to go.  While I worked with the other crews we would discuss these policies." (*Id.* at ¶ 9.)

Averus counters that its overtime policies are compliant with the FLSA: "non-exempt, hourly employees are paid for **compensable travel time** and overtime when they work over forty hours in a workweek." (Doc. # 34-1 at ¶ 13) (emphasis added). Specifically:

> Most Lead Service Technicians who drive an Averus-owned truck from their home to customer sites (except the Gurnee[, IL] branch), and most Service Technicians who report in their personal vehicles from home (except the Gurnee branch), are paid for all travel time from their home to the first customer site that is in excess of one hour, and all travel time from the last customer site to their home that is in excess of one hour. Additionally, Lead Service technicians and Service Technicians are paid for all travel time between customer sites during their shifts.
>
> . . .
>
> The only time Lead Service Technicians are not paid is normal home-to-work commute time (up to one hour) and any breaks that are thirty minutes or longer.  It is also Averus' policy that Lead Service Technicians and Service Technicians are paid overtime premium pay for all hours worked over forty in a work week.

(Id. at ¶¶ 13-14.)

Plaintiff further alleges that Averus failed to keep proper time records, as required by 29 C.F.R. § 516.  Specifically, Plaintiff contends that Averus' records are inaccurate because Averus (1) had branch managers record employee time for their Drivers and Helpers in the field, despite not being in the field with employees; and (2) in recording employee time, used a form which did not provide a separate area for tracking driving

time.  *See* (Doc. # 34-2 at ¶ 12) (noting that "Shank, the-then Branch Manager for

Denver, did not have separate entries for the different types of travel time. Shank added

all of the travel time for a given day under the 'other hours' column; therefore, the

'regular hours' column contained the time spent working at a customer site and the

'other hours' column contained the travel time.")  Plaintiff also alleges that the Denver

branch did not have a notice posted to inform employees of their rights under the FLSA,

as required by 29 C.F.R. § 516.4.  (Doc. # 16-1 at ¶ 14.)

## B.  OTHER AVERUS EMPLOYEES

Averus indicates that at its corporate branch in Gurnee, IL, that Drivers and

Helpers report directly to the branch on a daily basis to pick up paperwork and their

vehicles.  (Doc. # 34-3 at ¶ 6.)  Additionally, Gurnee  employees do not take their

Averus vehicles home.  (*Id.*)  Other employees in Averus' corporate office, such as

administrative support staff, do not travel at all to customer sites.  (Doc. # 34-1 at ¶ 7.)

Averus' Fire Protection Division is responsible for selling fire protection and

suppression equipment.  Fire Technicians within the Fire Protection Division work alone,

travel to customer sites during business hours, and are paid a base salary plus

commission.  (Doc. # 16-2 at ¶ 8.)

## II.  LEGAL STANDARD

Section 216(b) of the FLSA provides a unique procedural mechanism allowing

"collective" actions for minimum wage and/or overtime violations.  Such actions "may be

maintained against any employer . . . by any one or more employees for and in behalf of

himself or themselves and other employees similarly situated."  *Id.*  Unlike class actions

under Rule 23 of the Federal Rules of Civil Procedure, an FLSA "collective class" only includes members who expressly opt in to the class in writing.   *Id.*

The Tenth Circuit has approved of the use of a two-step, case-by-case process for determining whether putative employees are "similarly situated" to the named plaintiff(s) for purposes of Section 216(b).   *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102-1105 (10th Cir. 2001) (approving of the "ad hoc" two-step approach and describing it is as "arguably . . . the best" approach for 216(b) actions, because "it is not tied to the rule 23 standards.")

During the "first stage," the Court makes an initial, so-called "Notice" determination of whether the named plaintiff(s) and the opt-in "class" are "similarly situated."   *Id.* at 1102-03.   That is, the district court determines whether a collective action should be certified for purposes of sending notice of the action to potential class members.   *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995). Because this determination is typically made before the parties complete discovery, it "'require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'"   *Thiessen*, 267 F.3d at 1102 (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)). At this stage, "a court need only consider the substantial allegations of the complaint along with any supporting affidavits or declarations." *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA, 2012 WL 1414325 (D. Colo. Apr. 21, 2012).   In making the decision as to conditional certification, "the court does not weigh evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims."   *Id.*

The standard at the Notice juncture is a "fairly lenient" one, and usually results in conditional certification. *Thiessen,* 267 F.3d at 1103 (describing the standard as "fairly lenient"); *Mooney*, 54 F.3d at 1214 ("Because the court has minimal evidence, [the notice-stage] determination . . . typically results in 'conditional certification' of a representative class"); *Renfro v. Spartan Computer Servs., Inc.*, 243 F.R.D. 431, 432 (D.Kan. 2007) (same); *Williams v. Sprint/Un. Management Co.*, 222 F.R.D. 483, 485 (D. Kan. 2004) (same). The "similarly situated" standard is considerably less stringent than Rule 23(b)(3) class action standards. *Pegues v. CareCentrix, Inc.*, 12-2484-CM, 2013 WL 1896994, at *1 (D. Kan. May 6, 2013) (citing *Grayson v. K–Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)). If the district court "conditionally certifies" the class, putative class members are provided with court-approved notice and the opportunity to opt in to the action, and the matter proceeds as a representative action throughout discovery. *Hoffman–La Roche Inc. v. Sperling*, 493 U.S. 164, 170-71 (1989); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001).

At the conclusion of discovery – often prompted by a motion to decertify by the defendant – the Court makes a second determination, utilizing a stricter "similarly situated" standard, examining the "disparate factual and employment settings of the individual plaintiffs." *Thiessen*, 267 F.3d at 1102-03; *Vaszlavik*, 175 F.R.D. at 678. During this "second stage," the Court analyzes several factors, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and

procedural considerations; and (4) whether Plaintiff made any requisite statutory filings

before bringing suit   *Id.* at 1103.

This case is in its early stages, and little discovery has changed hands.  As such,

the Court will analyze the instant Motion under the lenient "notice stage" standard

described above.

### III.  ANALYSIS

#### A.  WHETHER A COLLECTIVE ACTION SHOULD BE CONDITIONALLY CERTIFIED AS TO EITHER A "NATIONAL" OR "DENVER-SPECIFIC" CLASS

In July of 2014, Plaintiff filed the instant Motion, requesting that this Court certify

the following "opt-in" class, which includes employees at all of Averus' branches ("the

National Class"):

> ALL CURRENT AND FORMER HOURLY NON-EXEMPT EMPLOYEES
> OF THE DEFENDANTS WHO WERE NOT COMPENSATED FOR ALL
> HOURS WORKED AND/OR WERE NOT PAID OVERTIME FOR HOURS
> WORKED IN EXCESS OF 40 IN A WEEK.

(Doc. # 16 at 5-6.)  Plaintiff also seeks to certify a "sub-class" for the Denver Averus

location in particular ("the Denver Class"), composed of:

> ALL CURRENT AND FORMER HOURLY NON-EXEMPT EMPLOYEES
> OF THE DEFENDANTS WHO WERE NOT COMPENSATED FOR ALL
> HOURS WORKED AND/OR WERE NOT PAID OVERTIME FOR HOURS
> WORKED IN EXCESS OF 40 IN A WEEK AT DEFENDANT AVERUS'
> LOCATIONS CONTROLLED BY MICHAEL SHANK.

(Doc. # 16 at 6.)

Defendants' primary argument in opposition of notice certification is that Plaintiff

has failed to provide sufficient allegations that he and other Averus employees were

subject to a common policy or practice regarding overtime pay, either in Averus' Denver

location or in the five other branches (and four other states) in which Averus operates. As elaborated below, the Court agrees with Defendants as to Plaintiff's failure to demonstrate proof of a national policy, but disagrees as to the establishment of a common policy or practice in the Denver branch.

In support of its Motion, Plaintiff submitted two affidavits from Avendano indicating the following, with regard to a common policy or practice (either in Denver or otherwise):

- "During the entirety of my time working for Defendant Averus, I consistently worked more than 40 hours in a week and was never paid any overtime." (Doc. # 16-1 at ¶ 3.)

- "My helper and I frequently worked more than 40 hours per week and were only paid for 40 hours of work." (Doc. # 41-1 at ¶ 4.)

- "When I was sent to an out-of-state location for Averus, I was not paid for my driving time." (Doc. # 16-1 at ¶ 6.)

- "If a job was in Colorado, but out of the Denver Metropolitan area, we were not compensated for driving time." (*Id.* at ¶ 7.)

- "If, for any reason, my coworker and I did not complete all of our assignments during our normal Sunday through Thursday workweek, we were forced to work Friday for no additional pay to complete those jobs.  This was true whether the reason we didn't complete the job was our fault, or someone else's fault  . . . Mike Shank often assigned extra locations on Friday in addition to the ones we

hadn't completed in the allotted time.  We did not receive any additional money for this work."  (*Id.* at ¶ 12.)

• "Shortly after I began working for Averus, I asked Michael Shank why I was not paid for all the hours I worked.  Michael Shank told me that it was Averus' policy to only pay Drivers and Helpers for 40 hours of work per week regardless of how many hours were worked."  (Doc. # 41-1 at ¶ 6.)

• "I did not keep track of my work time because I was never told to and it was not necessary given Averus' policy of only paying for 40 hours no matter how many hours were worked."  (*Id.* at ¶ 7.)

• "Other than Michael Shank telling me it was Averus' policy, I also know the other two-man Driver-Helper cleaning crews were only getting paid for 40 hours a week when they worked more than 40 hours per week because on some larger jobs more than one van with a Driver-Helper crew would have to go.  While I worked with the other crews we would discuss these policies."  (*Id.* at ¶ 9.)

• "Without my input, Michael Shank created time sheets for my work and I had to sign them in order to be paid.  These time sheets almost always reflected exactly 40 hours of work."  (*Id.* at ¶ 8.)

The Court concludes that these allegations are sufficient to support conditional certification of this action as to the **Denver** class of **Drivers** and **Helpers** in particular. Plaintiff's Complaint, along with Plaintiff's two declarations in support of the instant Motion, provide substantial allegations that both Plaintiff and at least some of the 8-14 other Drivers or Helpers at the Denver Branch were subject to Shank's "single decision,

policy, or plan" not to pay overtime hours. *See Thiessen*, 267 F.3d at 1102.  Plaintiff's

Declarations indicate that 1) he actually worked in excess of 40 hours in a week,

including his driving time; 2) was never paid wages (or an overtime premium) for doing

so; and 3) was told by his manager that Averus had a policy to not compensate Drivers

and Helpers for hours in excess of 40 per week.  (Doc. ## 16-1; 41-1.)  He also

indicates that at least some other Drivers and Helpers worked more than 40 hours per

week and were not paid for this work, and that they were aware of Defendants' policy

because Plaintiff discussed it with them.  (*Id.*)  Although his allegations are not

extremely detailed, Plaintiff's burden is merely to present "substantial **allegations**" that

all members of the putative class were subject to a single decision, policy or plan, and in

light of the fact that little discovery has occurred in this case, these allegations are

sufficiently "substantial" here to meet the Notice standard.  *See Miller v. Startek USA,*

*Inc.*, 11-CV-00017-REB-CBS, 2011 WL 1883012, at *2 (D. Colo. May 17, 2011) ("Given

that lenient standard, and the fact that little discovery has yet occurred in this case, I

find that it would be both legally erroneous and simply unfair to accept the invitation

implicit in defendant's voluminous evidentiary submission to investigate further the

potential efficacy of the allegations at this stage.")

    Defendants note, however, that Plaintiff has no personal knowledge of the

overtime policies or practices that applied to other job classifications at the Denver

branch.  (Doc. # 34 at 9.)  Indeed, Plaintiff has submitted no evidence indicating that

other hourly, non-exempt employees were subjected to an illegal overtime policy, and

his allegations relate to the Denver location's Drivers and Helpers only: "Michael Shank

told me that it was Averus' policy to only pay **Drivers and Helpers** for 40 hours of work per week regardless of how many hours were worked." (Doc. # 41-1 at ¶ 6) (emphasis added). This problem is further underscored by the fact that Shank only supervised Drivers and Helpers – **not** other hourly, nonexempt employees. (Doc. # 34-2 at ¶ 4) ("I supervised Lead Service Technicians and Service Technicians in the Kitchen Exhaust Cleaning ("KEC") Division. I did not supervise any employees in the Fire Protection or Filter Divisions, or any other non-exempt, hourly employees.") Accordingly, because the allegations of the Complaint and Plaintiff's declarations do not support the notion that the common policy extended to "all" of hourly non-exempt employees in Denver, the subclass definition must be modified to include the more limited class of Drivers and Helpers only.

Defendants provide two other arguments in opposition to certification of the Denver subclass. First, Defendants submitted declarations from two Drivers and four Helpers who work at its Denver branch, stating that they were fully paid for travel time and overtime. (Doc. # 34-5.) However, such declarations do not definitively prove that Defendants **did not** have a policy in place, only that a policy might not have been uniformly enforced. *See Murphy v. LenderLive Network, Inc.*, 13-CV-03135-RBJ, 2014 WL 5315023, at *3 (D. Colo. Oct. 17, 2014) ("Finally, having paid some overtime in the three years preceding this suit does not establish as a matter of law that the underwriters were compensated for all of their work performed in excess of 40 hours per week.") Additionally, Plaintiff is correct that, at this stage in this proceeding, courts generally afford little importance to the so-called "happy camper" affidavits of co-

workers offered by defendants at this stage of litigation.[3]  *See Hose v. Henry Indus., Inc.*, 13-2490-JTM, 2014 WL 4749431, at *6 (D. Kan. Sept. 24, 2014) (citing *Chastain v. Cam*, No. 13–1802–SI, 2014 WL 3734368, *5 (D. Or. July 28, 2014) ("happy camper" affidavits not considered at the conditional certification stage)).  Second, Defendant objects that Plaintiff's declaration is too vague: "Plaintiff vaguely refers to discussions [with Shank] about 'this policy' with 'other Driver-Helper pairs,' but he does not identify names."  (Doc. # 45 at 5.)  However, Defendant cites no authority – and the Court found none – indicating that a plaintiff must specifically identify the names of coworkers who were subjected to a policy in order to meet the "similarly situated" standard.

As for the proposed National Class, Plaintiff argues that he and other hourly workers in Averus' branch locations across six states were subjected to the following common policies or practices: "(1) failing to pay overtime premiums; (2) failing to compensate employees at all for time spent driving to and from customer locations; (3) failing to compensate employees for all of the time they worked; and (4) failing to pay class members the wages mandated by FLSA on each pay day."  (Doc. #16 at 6-7.) However, the evidence Plaintiff submits in support of these policies fails to establish either that allegedly unlawful Denver overtime/minimum wage policy was implemented in other Averus branch locations or that other Branch Managers had similar policies of their own.

In addition to his own declaration's allegations pertaining to the Denver branch's policy regarding overtime wages, Plaintiff points to evidence indicating that Averus had

_____

[3] The Court has taken note, however, that six of the 8-14 potential class members have indicated in these affidavits that no violation has occurred.

similar work duties, wages, and scheduling expectations for its open positions (the descriptions are for "service technicians" generally) in St. Paul, MN.  (Doc. # 16-2 at 54) ("This is a Full-time position. Tech avg $10-$15 per hour and work a 40 hour week, typically the work schedule is from Sun night-Thursday night.")  Plaintiff also submits "want-ads" with the job descriptions of open Driver or Helper positions in some of its other branches, including Denver, CO; Nashville, TN; and Milwaukee, WI.  (*Id.* at 51-52, 56-58, 60-61.)

Although these "want-ads" establish that the positions had similar job duties to Plaintiff's position and that they were full time (i.e., 40 hours per week), they do not establish anything as to an **overtime compensation policy or practice**; rather, the Court would have to improperly **assume** that employees in other locations a) worked over 40 hours **and** b) that any allegedly unlawful practice in Denver as to failure to properly pay for overtime hours was consistent with Averus' policies in its other locations.  Indeed, more generally, Plaintiff has presented no allegations or evidence from which Court could infer that employees in Defendants' other branches were also not paid overtime.  *Compare Barnwell v. Corrections Corp. of Am.*, 2008 WL 5157476, at *3 (D .Kan. Dec. 9, 2008) (conditionally certifying a class of employees from 65 facilities because the plaintiffs had provided sworn statements from **200 corrections officers representing numerous facilities in various states,** such that the court could infer that an alleged policy at one facility was indeed a company-wide policy); *Hose v. Henry Indus., Inc.*, 13-2490-JTM, 2014 WL 4749431, at *12 (D. Kan. Sept. 24, 2014) (finding plaintiff submitted substantial allegations as to a company-wide policy because

"The drivers are employed pursuant to a standard form Cartage Agreement.  All of the evidence presented to the court from both sides indicates that the decision to treat drivers as independent contractors is a company-wide policy"); *with Braun v. Superior Indus. Int'l, Inc.*, No. 09–2560–JWL, 2010 WL 3879498, at *6 (D. Kan. Sept. 28, 2010) (certifying class at one facility only, because "[n]one of the named plaintiffs or the opt-in plaintiffs purport to have any knowledge of the pay practices in defendant's [other] facilities.  Moreover, there are no allegations or evidence from which the court could infer that employees in those facilities are required to perform pre-and post-shift work").

Although Plaintiff argues that Defendant Michael Shank had responsibilities that went beyond the Denver region – and thus imply that he served as a kind of "common thread" among the branches as to Averus' wage and overtime policies – the only evidence in support of this argument relates to the meaning of Mr. Shank's job title: "[Shank] was not a mere branch manager . . . According to Averus' website he is 'Regional Operations Manager', as opposed to a mere 'Branch Manager', and **presumably implements** consistent policies throughout his region."  (Doc. # 16 at 8) (emphasis added).  Plaintiff has submitted no evidence, however, indicating that a "Regional Operations Manager" **or** a "Branch Manager" does, in fact, implement policies on a region-wide level – much less that either type of manager does so for compensation or overtime policies in particular.  Indeed, Defendants submitted an undisputed declaration[4] from Averus' Vice President to the opposite effect, regarding

---

[4] It bears mention that the Court is not making a factual finding or weighing the evidence at this stage; it is merely noting that not only did Plaintiffs fail to submit evidence indicating that there was a national or regional policy as to wages and overtime, but that Defendants have also

the power of Branch Managers: "Each Branch Manager is solely responsible for the operations of their [sic] assigned branch, and they [sic] are not responsible for supervising other branches.  Although Branch Managers are not provided with company policies and guidelines to enforce, Branch Managers are given discretion with how to apply policies and forms used.  This results in different practices among the branches." (Doc. # 34-1 at ¶ 10.)  Because Plaintiff has failed to proffer evidence that Shank had authority beyond the Denver branch, his employment as a "Regional Operations Manager" does not support the existence of a common policy.  *See Hobbs v. Tandem Envtl. Solutions, Inc.*, No. 10-1204-KHV, 2011 WL 484194, at *2 (D. Kan. Feb. 7, 2011) ("plaintiffs make no allegations of company-wide policies or practices. Rather, all of plaintiffs' allegations are against TESCO and [one particular supervisor] together, and therefore cannot extend beyond [that supervisor's] scope of authority—the [single] Wichita district beginning on July 1, 2009.  The Court therefore limits plaintiffs' proposed class to TESCO office cleaners employed by its Wichita branch.")

Lastly, Plaintiff submitted two examples of the forms he was given prior to completing each job, noting that the Averus logo appeared on the top of the forms and that the form provides a return address for Averus' headquarters in Illinois.  (Doc. # 16-1 at 5, 7.)  Plaintiff also points to the IVR check-in and check-out procedure instructions on these forms as evidence of a national, uniform policy, stating that if an employee failed to follow the check-in procedure, it "would exclude any compensation for driving time because of its requirements."  (Doc. # 16 at 8) (citing Doc. 16-1 at 5, 7) ("Failure to

---

submitted competent evidence (which was not rebutted by Plaintiffs) indicating that such a policy did not exist.

check out will result in no payment for the service performed.")  However, Averus has

submitted undisputed evidence[5] that the IVR system was **not** tied in any manner to

Plaintiff's compensation – or to that of other employees:

> The IVR instructions have nothing to do with Mr. Avendano's, or any other
> employee's, compensation.  The IVR is a record keeping requirement of
> some customers.  If Averus employees fail to follow the IVR instructions,
> then Averus may not be paid for the service, but it does not have any
> impact on whether Plaintiff or any other employee is paid for the hours
> worked at that customer.  Averus employees will still be paid for the time
> worked at the customer site.

(Doc. # 34-1 at 10-11.)  Even assuming, then, that the IVR policy was used on a

national level, it is not probative as to a uniform, national policy relating to overtime

compensation.

       As Plaintiff has failed to provide "substantial allegations" that the allegedly

unlawful Denver overtime/minimum wage policy was implemented in other Averus

branch locations, or that other Branch Managers had similar policies of their own, the

Court denies the Plaintiff's Motion as to the National Class.[6]

---

[5] *See supra* n. 4.

[6] Plaintiff also argues that Defendants admitted in their Response brief that Averus subjects its
Drivers to an "arguably" unlawful policy at all of its branches (Doc. # 41 at 6) – namely, that
Drivers "who drive an Averus-owned [specially-equipped] truck from their home to customer
sites are paid for all travel time from their home to the first customer site that is in excess of one
hour, and all travel time from the last customer site to their home that is in excess of one hour."
This policy, however, was not one for which Plaintiff sought certification in the initial certification
motion.  Additionally, the Court has not found a case in which a court granted conditional
certification as to an "arguably" unlawful policy; rather, Section 216(b) permits certification when
a policy is unlawful.  *See In re Bank of Am. Wage & Hour Employment Litig.*, 286 F.R.D. 572,
580 (D. Kan. 2012) (declining to certify class because Plaintiffs failed to submit evidence of an
unlawful policy: "At most, manager emails reflect continuous pressure to . . . aggressively
manage overtime expense—instructions which are undisputedly lawful.")  The Court is
particularly hesitant to do so when the "arguably" unlawful policy implicated here would involve a
very fact-specific inquiry as to whether driving a specially-equipped, employer-provided vehicle

### B.  EQUITABLE TOLLING

Unlike Rule 23 class actions, the commencement of an FLSA collective action does not toll the statute of limitations for putative class members. 29 U.S.C. § 256(b). Thus, absent an order from the court tolling the applicable statute of limitations period, the limitations period for each putative member of the class is three years (assuming, as is the case here, the allegation of a willful violation of the statute), prior to the date he or she opts into the action.  *Id.* §§ 255(a), 256(b).  The statute, in other words, contains a look-back provision which limits to three years from opt-in how far back a plaintiff can look to find violations by his or her employer.  *In re Bank of Am. Wage & Hour Employment Litig.*, 10-MD-2138-JWL, 2010 WL 4180530, at *2 (D. Kan. Oct. 20, 2010).

In his Motion, Plaintiff requests that the Court equitably toll the class' FLSA claims as of July 10, 2014, that is, the date that Plaintiff filed the instant Motion. Although the doctrine should be "invoked sparingly," equitable tolling permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity. *Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1181 (D. Colo. 2012). Nevertheless, the Tenth Circuit has not addressed the circumstances in which the equitable tolling doctrine applies to FLSA claims in particular.  Defendants cite cases

---

is an "integral and indispensable" part of the principal activity of an employee's work. *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1350 (10th Cir. 1986) *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) (noting that this question "must be decided upon its peculiar facts"); *see also Baker v. Barnard Const. Co., Inc.*, 146 F.3d 1214, 1218-19 (10th Cir. 1998) (in holding that a jury should consider contradictory testimony and evidence as to whether employees were "required, by policy or practical reality, to transport the rigs from the work site each day to refuel and restock," noting that it is "difficult to fix a definite standard for determining what activities of an employee, performed before and after his hours of work, are an integral part of and indispensable to his principal activities").  As such, the Court denies this aspect of Plaintiff's Motion without prejudice.

which apply a relatively strict standard, outside of the FLSA context; Plaintiffs primarily cite cases applying a more lenient standard, focusing on tolling in the interest of justice. It seems relatively clear, however, that regardless of the standard employed, "equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline **unavoidably arose** from circumstances **beyond that litigant's control**." *Id.* (emphasis added) (quoting *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)).  The decision to invoke equitable tolling in a particular case lies exclusively within the sound discretion of the trial court.  *Id.*

According to Plaintiff, equitable tolling is in the interest of justice here. Specifically, Plaintiff has asserted that a notice informing him of his FLSA rights was not posted at his worksite, as required by 29 C.F.R. § 516.4.  (Doc. # 16-1 at ¶ 14.) Additionally, he asserts that time records were improperly or "sloppily" kept – both because the in-house branch manager was responsible for preparing the records and because there was no separate category allowing a branch manager to record "travel time" – such that opt-in Plaintiffs might not know that they had worked more than 40 hours.  (Doc. # 41 at 8.)

Early notice to Opt-in Plaintiffs in a collective action such as this is favored, however, and nothing in the record of this case shows that any potential opt-in plaintiff was deceived, misled, lulled into inaction, or otherwise faced extraordinary circumstances that made it impossible for them to file a timely FLSA claim.  Plaintiff's argument is ultimately rooted in the assumption that potential opt-in plaintiffs could not know about the facts that are the basis of their possible FLSA claim until they receive

notice of a collective action.  Generally, however, "potential opt-in plaintiffs are presumed to be aware of the facts and circumstances of their employment . . . and it is those facts and circumstances that allegedly form the basis of each plaintiff's FLSA claim . . . Generally, their claims accrue when they gain knowledge of these facts." *Young v. Dollar Tree Stores, Inc.*, 11-CV-1840-REB-MJW, 2013 WL 1223613, at *2 (D. Colo. Mar. 25, 2013).

As such, the Court declines to equitably toll the statute of limitations here as to the Denver class.

## C.  NOTICE

"Under the FLSA, the Court has the power and duty to ensure that the notice is fair and accurate, but it should not alter Plaintiff's proposed notice unless such alteration is necessary."  *Pizza Hut, Inc.*, 2012 WL 1414325, at *7.

Defendants did not respond to Plaintiff's proposed notice, except to say in a single sentence that "the Court should allow the parties to propose a joint notice, rather than adopting the Plaintiffs' proposed notice without input from Defendants, because it is insufficient."   (Doc. # 34 at 15.)  Although the Court would have preferred the Defendants to outline why the proposed Notices were "insufficient" in their Response, because the Court has limited Plaintiff's proposed class, the court directs the parties to meet and consult regarding their remaining differing positions on notice content.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS Plaintiff's Motion in part (Doc. # 16) and conditionally certifies the Denver Class.  It is further

ORDERED the parties shall meet and confer and submit, within fourteen days of this order, a joint proposed Notice as to the Denver class (with the necessary modifications as set forth in this Order).  If the parties cannot agree on joint language, the parties are ordered to submit, simultaneously and within fourteen days of the date of this order, their respective proposed notice with a brief explaining the scope of their disagreement and the legal support for their respective language.  Needless to say, the parties are encouraged to reach an agreement without the Court's intervention.

DATED: March 31, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge