**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-01614-CMA-MJW

ALFONSO AVENDANO, on behalf of himself and others similarly situated

   Plaintiff,

v.

AVERUS, INC. *et al.*

   Defendants.

---

**MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3) AND APPOINTMENT
OF CLASS COUNSEL UNDER RULE 23(g)**

---

**CERTIFICATE OF CONFERAL PURSUANT TO D.C.COLO.LCIVR 7.1(A)**

   Plaintiff's counsel conferred with Defendants' counsel prior to filing this Motion. Defendants' counsel previously indicated opposition to this Motion. In advance of filing this Motion, Plaintiff's counsel attempted to contact Defendants' counsel to confirm this opposition by email and phone and received no response.

**I. INTRODUCTION**

   Averus's Drivers and Helpers drive through the night from restaurant to restaurant cleaning kitchen exhaust hoods for Averus's customers. They frequently work long hours, and often work in excess of forty hours per week. And, yet, in violation of state employment laws, they do not receive pay for all of the hours they work, including travel time and time spent waiting at restaurants to start cleaning jobs. Plaintiff seeks to represent a nationwide class of the low-wage workers who are victimized by these company-wide policies and practices.

1

## A.  Procedural Posture

In March 2015, the Court granted in part and denied in part Plaintiff's motion to certify a collective action under the Fair Labor Standards Act, 29 U.S.C. § 216(b). The Court concluded that Plaintiff's intimate knowledge of the wage-payment practices at Averus's Denver branch was sufficient to support certification of a collective action of "service technicians" (or "Helpers") and "lead service technicians" (or "Drivers") working at that branch. *Avendano v. Averus, Inc.*, No. 14-CV-01614-CMA-MJW, 2015 WL 1529354, at *6 (D. Colo. Mar. 31, 2015). However, the Court denied certification of a "National Class." *Id.* at *8.

After Plaintiff filed his first motion for certification of a FLSA class, he learned more about Averus's policies and practices. *See* Ex. 1 Hood Decl. ¶ 16 (hereinafter, "Hood Decl."). Based on evidence unearthed through discovery, and particularly admissions by Averus's corporate representative at a Rule 30(b)(6) deposition, Plaintiff can now point to considerable evidence of Aversus's company-wide practices and policies of underpaying its employees. Plaintiff moves to certify, under Rule 23(b)(3), a class of most of Averus's current and former Drivers and Helpers and—in a concurrently filed motion—to certify a nationwide FLSA class in addition to the already-certified opt-in class of Denver-based Drivers and Helpers.

## B.  Averus's Common Policy of Underpaying Workers

Averus is based in Gurnee, Illinois. It also has branch offices in Colorado, Indiana, Minnesota, Missouri, Tennessee, and also employs Drivers and Helpers operating out of Wisconsin. Hood Decl., Ex. A, at 39-40 ("Averus 30(b)(6) Dep."). This case involves Averus's Kitchen Exhaust Cleaning Division, and in particular the Drivers and Helpers who perform work for this division by driving from Averus customer to Averus customer to clean kitchen exhaust cleaning systems. *Id.* at 14-16. Averus

currently employees at least 40 Drivers and 40 Helpers across the country. ECF Doc. 34-1 at ¶ 11.

Drivers and Helpers usually start their shifts sometime in the evening and finish them in the morning. Averus 30(b)(6) Dep. at 22-23. At every Averus branch, Drivers and Helpers are assigned a company vehicle. Averus 30(b)(6) Dep. at 18. And at every Averus branch, with the exception of Gurnee, the Drivers drive that vehicle home when they complete their cleaning tasks for Averus's customers. Averus 30(b)(6) Depo. at 62-63. Drivers and Helpers working out of all of Averus's branches, except the Gurnee branch, generally start their shifts by driving their company-owned vehicle directly to the first Averus customer for the evening,[1] and then between Averus customers throughout the night. After servicing their final customer or completing tasks at Averus's branch office, Drivers and Helpers working at every branch except Gurnee return home in their company-owned vehicle. Averus 30(b)(6) Dep. at 22; *see also id.* at 51 (describing changing practices with respect to retrieving job orders).[2]

Averus employs at least three company-wide policies that result in a systematic denial of Drivers' and Helpers' legal wages.

**Failure to Pay Wages for Compensable Wait Time:** By company-wide policy, after completing a cleaning job, Drivers and Helpers immediately must drive to the location of the next job. Averus 20(b)(6) Dep. at 25:6. Frequently, however, because of circumstances out of their control, Drivers and Helpers are not able to begin working on a job when they arrive on site, and sometimes not for a number of hours after they arrive. *Id.* at 65-66 (discussing example of three-hour wait period); Ex. 2 Avendano

---

[1] Drivers often pick up their Helpers before driving to the first customer. Avendano Decl. ¶ 4.

[2] Drivers and Helpers at the Gurnee branch start every shift by picking up a company-owned vehicle at the branch location and complete every shift by dropping that vehicle off at the branch location. Averus 30(b)(6) Dep. at 63.

Decl. ¶¶ 8-9 (hereinafter, "Avendano Decl.").

Pursuant to company policy, Drivers and Helpers are compensated for the time traveling between sites and for a thirty-minute "break" upon arriving at a new job, but they are *not* compensated for any of the time that they frequently must wait beyond their thirty-minute "break" before beginning the new job. Averus 30(b)(6) Dep. at 66.  Even though Drivers and Helpers are off-the-clock during this wait time—*i.e.*, not paid— Averus forbids them from traveling anywhere other than to their next job. Indeed, Drivers and Helpers "are instructed to use the van per company policy to go to and from work, in between jobs, to the warehouse and/or storage unit, and directly home. They are not to use it anything outside of that scope." *Id.* at 24:18-22; *see also* 24:23 to 25:9 ("Not by policy…. By our policy, they are to go from point A to point B, per job assignment, and take the time to get there"); 67-68 (company policy prevents Drivers and Helpers from going home during gap between jobs). If they use the vehicle for another purpose, they are "disciplined." *Id.* at 71:8-9. The result is that Drivers and Helpers are trapped in their vans between jobs waiting for the next job to begin. Plaintiff Avendano never considered this wait time as a "break" from work because he was required to remain onsite and often had to start preparing his equipment for the job to ensure that he and his Helper were able to complete it with sufficient time to drive to the next job site. Avendano Decl. ¶ 10.

**Failure to Pay for Compensable Travel Time:** Averus also has a policy of not paying Drivers and Helpers for all of their travel time from home to the first Averus customer at the beginning of their shifts and for travel time from the last Averus customer (or Averus warehouse or storage facility) to home at the end of their shifts.

Averus 30(b)(6) Dep. at 54-55.[3]

Drivers and Helpers are not compensated for all of this time even though most Drivers and Helpers must use a company vehicle for all of their work-related travel. These vehicles are large vans containing massive equipment for cleaning industrial kitchen hoods and minimal passenger seating. ECF Doc. 41-1, at ¶ 4. Drivers are prohibited from using these vehicles for any purpose other than driving to, from, and between their job sites. Averus 30(b)(6) Dep. at 24; Avendano Decl. ¶ 5.

**Failure to pay overtime and pay for all hours worked, even under Averus's stated company policies:**  Finally, to avoid paying overtime due under state and federal law, Averus—or at least the Denver branch overseen by Michael Shank—has a policy of routinely refusing to count any of Drivers' and Helpers' work time beyond 40 hours per week. Averus also appears to have an unwritten policy of routinely failing to pay Drivers and Helpers for all of the hours that they work, even as determined by the company's stated policies.

Shortly after Plaintiff began working for Averus, Defendant Shank told him that "it was Averus' policy [to only pay] Drivers and Helpers for 40 hours per week regardless of how many hours they worked." ECF Doc. 41-1, at ¶ 6.  Plaintiff also knows that Averus subjected other Drivers and Helpers at the Denver branch to the same policy. *Id.* Furthermore, Plaintiff has stated that he was routinely denied pay for time traveling between worksites, even though that time is supposed to be compensable under Averus's stated policies. *See, e.g.*, ECF Doc. 16-1, at ¶¶ 5-7 (stating that Plaintiff was

---

[3] This travel time is compensated only to the extent that it exceeds one hour. For example, if a Driver and Helper must drive for 90 minutes in a company-owned vehicle from the moment that they meet before their shift until arriving at the site of their first job, Averus compensates them only for 30 minutes of their travel time. Averus 30(b)(6) Dep. at 55.

routinely denied pay for travel time).

Plaintiff's contentions find support in his timesheets, some of which are part of the record in this case. The vast majority of Plaintiff's timesheets supplied by Plaintiff *and* by Defendants reflect that he worked 40 hours per week or less. *See*, *e.g.*, ECF Doc. 34-1, Exs. A-D; ECF No. 41-1, Ex. 1 (together reflecting only one week out of nine when Plaintiff's timesheets state that he worked more than 40 hours per week). Perhaps most tellingly, six out of nine weekly timecards produced by Plaintiff and by Averus report that Plaintiff worked *exactly* 40 hours per week. In light of the inherently unpredictable and uncontrollable nature of Plaintiff's work time, and in particular his travel time, these records are implausible and suggest that Averus did not count all of Plaintiff's work time. *See, e.g.*, *Solis v. Cindy's Total Care, Inc.*, No. 10 CIV. 7242 PAE, 2012 WL 28141, at *13 (S.D.N.Y. Jan. 5, 2012) (defendant's reporting that employees worked *exactly* 40 hours per week suggested manipulation of timekeeping by defendant).

Plaintiff's contentions find further support in the fact that Aversus's timekeeping processes are sloppy and easily manipulable. Averus's corporate representative testified that Averus's timekeeping records are derived at least "to some extent" based on "work orders," which reflect when workers started and completed cleaning jobs. Averus 30(b)(6) Dep. at 42-44. According to Averus's publicly-stated company policies, however, Drivers and Helpers should be compensated for more than the time that they spend working at sites; at the very least, they should be compensated for their travel time between work sites and at least some of their wait time when they arrive at a customer site but are unable to begin working. The work orders do not measure this

time.[4]  Averus's corporate representative reported, however, that there are "no other documents that track" employees' compensable work hours other than the work orders and the final timesheets. *Id.* at 42. Averus branch managers calculate additional work time "mostly" based on the branch manager's "knowledge" of how long it would take to drive from one location to another. Averus 30(b)(6) Dep. at 55-56 ("I mean, you know how long it takes to get from Boulder to Aurora, you know.").  Although this patently unfair and inaccurate time-keeping practice could in theory be counterbalanced by employees reporting their time, Averus employees report their time *at most* half of the time. *Id.* at 56. Plaintiff Avendano has stated that he never kept track of his hours because he was never told to do so and because there was never any reason to track hours in light of the company policy of refusing to pay for more than 40 hours per week of work. ECF No. 41-1 at ¶ 7.

## II.   PROPOSED CLASSES AND RULE 23(A) "PREREQUISITES"

## C. The Proposed Classes:

### 1. Single Proposed Class Asserting Claims under State Employment Laws

To effectively challenge the three company-wide policies identified above, Plaintiff seeks to represent a class of most of Averus's current and former Drivers and Helpers asserting claims under the state employment laws of Colorado, Illinois, Indiana, Missouri, Minnesota, and Wisconsin.[5] That class should be defined as

---

[4] Although Averus's use of tablets to record "time in" and "time out" beginning in 2014 may have allowed Averus to measure job time more effectively, tablets still do not measure travel and wait time. Averus 30(b)(6) Dep. at 60-61.

[5] *See* Col. Rev. Stat. § 8-4-103 (requiring payment of all wages owed), 7 Col. Code. Reg. 1103-1 (overtime compensation); 820 Ill. Comp. Stat. § 115/1 (requiring payment of all wages owed), 820 Ill. Comp. Stat. § 105/4(a) (overtime compensation); Ind. Code § 22-2-5-1 (requiring payment of all wages owed), Ind. Code § 22-2-2-4 (overtime compensation); Mo. Stat. § 290.080 (requiring payment of all wages owed), Mo. Stat. §

> ALL PEOPLE CURRENTLY OR FORMERLLY EMPLOYED
> BY AVERUS AS SERVICE TECHNICIANS OR LEAD
> SERVICE TECHNICIANS IN AVERUS'S KITCHEN
> EXHAUST CLEANING DIVISION IN COLORADO,
> ILLINOIS, INDIANA, MISSOURI, MINNESOTA, AND
> WISCONSIN.

## 2.  Alternative Additional Subclass of Denver-Based Drivers and Helpers

The Court should certify the above class with respect to all three of the company-wide policies identified above, which are illegal under the laws of the states in which the putative class members work. If, however, the Court concludes that Plaintiff has mounted sufficient evidence of company-wide policies regarding wait- and travel-time pay but not sufficient evidence of a company-wide policy of failing to pay Drivers and Helpers for overtime and for all hours worked, even according to Averus's stated and contested policies for determining hours, then the Court *additionally* should certify a subclass defined as:

> ALL PEOPLE CURRENTLY OR FORMERLLY EMPLOYED
> BY AVERUS AS SERVICE TECHNICIANS OR LEAD
> SERVICE TECHNICIANS IN AVERUS'S KITCHEN
> EXHAUST CLEANING DIVISION IN COLORADO.

This subclass would mirror the FLSA opt-in class conditionally certified by the Court in *Avendano v. Averus, Inc.*, No. 14-CV-01614-CMA-MJW, 2015 WL 1529354 (D. Colo. Mar. 31, 2015), but would be certified under Rule 23(b)(3) and assert claims

---

290.505 (overtime compensation); Minn. Stat. § 177.25 (overtime compensation), Minn. Stat. § 181.01 (requiring payment of all wages owed); Wis. Stat. § 109.03 (requiring payment of all wages owed), Wis. Stat. § 103.025(c) (overtime compensation). Some Averus Drivers and Helpers are based in Tennessee, but Tennessee does not allow a private cause of action under its wage-and-hour laws. *See, e.g.*, Tenn. Stat. § 50-2-103(j). Depending on where Drivers and Helpers drive to perform their work, they may also have claims under the laws of states in which they were not based. Further discovery is required, however, to determine whether and when members of the proposed class have driven outside of these states.

under Colorado law. Col. Rev. Stat. § 8-4-103 (requiring payment of all wages owed), 7 Col. Code. Reg. 1103-1 (overtime compensation).

## D.  Plaintiff Satisfies the Requirements of Rule 23(a)

### 1.  Numerosity of the Proposed Class and the Alternative, Additional Subclass[6]

The proposed class is so "numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). Including employees based in Aversus's Tennessee branch, there are well over 80 current Drivers and Helpers working for Averus. The Court can reasonably infer, then, that there are over 80 current *and former* Drivers and Helpers based in all of Averus's branches *except* the Tennessee branch. Supporting both this inference, and the numerosity of the alternative, additional subclass, is the fact that there are over 50 current and former Drivers and Helpers who can assert claims within the FLSA statute of limitations based out of the Denver branch alone. Hood Decl. ¶ 18. The proposed class and the alternative, additional subclass, thus, presumptively meet Rule 23's numerosity requirement. Alba Conte, Herbert B. Newberg, & William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011) (suggesting that a class of 40 or more members should presumptively satisfy numerosity).

### 2.  Commonality

The proposed class also meets Rule 23's commonality requirement. There are at

---

[6] To be certified, the alternative, additional subclass must meet all of the requirements of 23(b)(3) class certification as well. All of Plaintiff's arguments regarding typicality, commonality, predominance, and superiority with respect to the proposed class's challenges to Averus's policy of consistently failing to pay overtime and for all hours worked apply with equal or greater force to the alternative, additional subclass.  After all, the subclass would have fewer members asserting claims under only one state's laws. The only prong of the 23(b)(3) class-certification inquiry regarding the alternative, additional subclass that requires special treatment is numerosity. Nonetheless, as shown here, although this class would have fewer members than the primary class, it would nonetheless also satisfy the numerosity requirement.

least three common questions at issue in this case, any of which would, on its own, support a finding of commonality: (1) whether the policy of refusing to pay Drivers and Helpers for the entire time spent waiting to perform a job, even though those workers cannot return home or otherwise use the company vehicle for their own purposes, violates the laws of the states in which Drivers and Helpers work? (2) whether the policy of refusing to pay Drivers and Helpers for their entire time commuting from home to worksites and from worksites to home, except to the extent that the commute exceeds one hour, also violates state employment law? and (3) whether Averus maintains a policy, written or unwritten, of consistently refusing to compensate employees for overtime and for all of the hours they work even under Averus's publicly-stated policies for determining work time? *DG v. Devaughn*, 594 F.3d 1188, 1194-1195 (10th Cir. 2010) ("A finding of commonality requires only a single question of law or fact common to the class.").

Because these questions, if answered in the affirmative, would resolve in "one stroke" issues central to the claims of the putative class, they each support a finding of commonality. *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011). With respect to the proposed class members' claims for wait-time pay, Averus has a company policy not only of refusing to pay for time waiting at a job site for a job to start but also of exerting considerable control over Drivers and Helpers during this off-the-clock time. Averus 30(b)(6) Dep. at 68:9. And, with respect to Plaintiff's travel-time claims, Averus has a company policy of not paying Drivers and Helpers for all travel time in company-owned vehicles, but also prohibits them from using their company-owned vehicles—which contain massive cleaning equipment, ECF Doc. 41-1, at ¶ 4—for any purpose other than driving from to, from, and between job sites. *Id.* at 24. The factfinder will be able to apply state employment laws regarding compensable work time to each of these

policies to resolve class members' claims on a classwide basis.

Averus's policy of refusing to compensate workers for all of the hours they work and of refusing to pay overtime—even under Averus's stated policies for determining compensable hours—raises a different type of common question. There can be no dispute that this policy violates the law. Rather, there is a common *factual* question about whether it exists, and in what form. This question need not be resolved now. It is enough at this stage for the Court to conclude that there is sufficient evidence in the record to certify the class based on the purported policy. Michael Shank's statement to Plaintiff that it was Averus's policy not to pay overtime should be enough evidence alone. *See Mancia v. Mayflower Textile Servs. Co.*, No. 08–0237, 2008 WL 4735344, at *3 (D. Md. Oct.14, 2008) (conditionally certifying a FLSA class when supervisor told one plaintiff that it was against the company's policy to pay overtime). But, as explained above, the existence of this companywide policy finds further support in Averus's inherently unfair and unreliable timekeeping practices and Plaintiff's timesheets.

### 3. Typicality

Plaintiff's claims are also "typical of the claims . . . of the class." Fed. R. Civ. Proc. 23(a)(3). Plaintiff was undisputedly a Driver for Defendant Averus and his claims arise from his allegations that he, like all of the members of the proposed class, was not paid for all of the hours he worked. Averus has never suggested that Plaintiff was not subjected to its policies regarding compensability of travel and wait time. Additionally, Plaintiff has consistently asserted that he was denied overtime and wages for all of the hours he worked because of the policies that Defendant Shank expressed to him. ECF Doc. 41-1; *see Bass v. PJCOMN Acquisition Corp.*, No. 09-CV-01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo. June 1, 2011) ("A plaintiff's claim is typical of class claims if it challenges the same conduct that would be challenged by the class.").

### 4. Adequacy

Plaintiff and Plaintiff's counsel can "fairly and adequately protect the interest of the class." Fed. R. Civ. Proc. 23(a)(4). There is no apparent conflict of interest between the potential class members and either the named Plaintiff or named Plaintiff's counsel. The named Plaintiff can only recover if he succeeds on legal theories that would also lead to recovery for the class. Moreover, the named Plaintiff's attorneys' incentives are aligned with the class as their contingent fee agreement with the named Plaintiff only allows the attorneys to be compensated if they successfully prosecute the suit. Hood Decl. ¶ 20; *see Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187-1188 (10th Cir. 2002).

Finally, Towards Justice and its attorneys are uniquely qualified to prosecute this action. *United Food & Commer. Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 654 (W.D. Okla. 2012) (internal citations omitted) (adequacy of class counsel "implicates "the experience and competence of the attorney[s] representing the class."). Towards Justice has bilingual staff members that can communicate with the Spanish-speaking members of the class. Hood Decl. ¶ 5. Towards Justices' attorneys also have the experience necessary to competently pursue this litigation. *See* Part V, *infra.*

## III. COMMON QUESTIONS OF LAW AND FACT PREDOMINATE AND A CLASS ACTION IS THE SUPERIOR METHOD OF RESOLVING THIS DISPUTE

This class should be certified under Rule 23(b)(3) because "questions of law or fact common to the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## A. <u>Predominance</u>

For common questions of law or fact to predominate under Rule 23(b)(3), "[i]t is

not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that answers to those common questions" be dispositive of the plaintiff's claims. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). Rather, "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted).

In addressing predominance the Court should take comfort in the continued role it can play, after certifying a class, in ensuring that the plaintiffs' claims are most efficiently prosecuted in a class action. *See, e.g.*, *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011) (affirming decertification of class where discovery revealed that individual issues would predominate). For this reason, "the interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968).

With respect to Plaintiff's claims for wait-time compensation, Defendants' refusal to pay employees for all of the time they spend waiting to start jobs at worksites results from a company-wide and uniformly-implemented policy. It is true that the question of whether an employee should be compensated for wait time generally turns on a fact-intensive inquiry. *See Skidmore*, 323 U.S. at 136. However, in this case, as explained above, Averus has a company-wide policy of refusing to pay workers for all of their wait time, while also refusing to allow Drivers and Helpers to use this time for many personal purposes. In fact, Averus disciplines its Drivers and Helpers if they leave the location of the job during this unpaid time. Averus 30(b)(6) Dep. at 68. Although Drivers and Helpers may have performed different tasks during this wait time, the fundamental and

common question is whether Averus's policy of refusing to allow Drivers and Helpers to use this wait time for their own personal purposes means that Drivers and Helpers are "engaged to wait" or "wait[ing] to be engaged" while they wait at job sites to perform their cleaning tasks. *Skidmore*, 323 U.S. at 137. That same common question will be determinative of all of proposed class members' state law wage-payment and wage-and-hour claims related to Averus's wait-time policies. *See, e.g.*, *Ridgeway v. Wal-Mart Stores Inc*, No. C 08-05221 SI, 2014 WL 4477662, at *8 (N.D. Cal. Sept. 10, 2014) (common questions of "whether drivers remained under Wal–Mart's control during layovers, rest breaks, and wait-times" predominated over individual questions like "whether some drivers completed tasks like paperwork during wait-time or attended to personal phone calls during layovers").

With respect to Plaintiff's claims for compensation for all of his travel time, common questions also predominate over individual issues. As explained above, Averus appears to have a company-wide policy of paying Drivers and Helpers for only some of their time commuting from home to the first worksite at the beginning of their shifts and from the last worksite to home at the end of their shifts. Also as a matter of Averus policy, most Drivers and Helpers drive company-owned vehicles containing Averus cleaning equipment during this time, and are not permitted to use these vehicles to do anything but drive straight from home to work and straight from work to home. Averus 30(b)(6) Dep. at 24. Whether such time is compensable under the state laws at issue here, thus, will turn on the common question of whether employees were "suffered or permitted to work" and under the control of Averus during this time because of the restrictions Averus placed on them. *Cf. Rutti v. Lojack Corp.*, 596 F.3d 1046, 1061 (9th

Cir. 2010) (describing California law on the issue).[7]

The Court need not and should not wade into the merits of proposed class members' travel-time claims at this stage, except to note that they will turn on the application of general and uniform legal principles to company policies related to the control exercised over Drivers' and Helpers' travel and the relationship between this travel and Drivers' and Helpers' principal work activities. The Tenth Circuit has applied those principles in affirming a jury's factual finding that multiple employees' "return travel time" in fueled and stocked rigs that those employees used to weld oil and gas pipelines was compensable under the FLSA because it was "integral and indispensable to those employees' "principal activities" at work. *Baker v. Barnard Const. Co.,* 146 F.3d 1214, 1216 (10th Cir. 1998).

Common questions also predominate over individual questions with respect to Plaintiffs' claims arising from Averus's policy of not paying legal wages and overtime and relying on a sloppy and incomplete timekeeping system to exacerbate and maintain this uniform policy. It is true, of course, as with Plaintiff's state claims arising from Averus's wait-time and travel-time policies, that some class members may have

---

[7] There may be *some* questions related to the proposed class members' claims for travel-time pay that do not apply to every member of the proposed class. For example, Drivers and Helpers working out of the Gurnee branch do not use company-owned vehicles for their travel time, which might alter the analysis for those employees' claims under state law. *See Rutti*, 596 F.3d at 1061 (describing importance of use of company-owned vehicle). This question, however, does not defeat predominance because the common question of the compensability of other class members' travel time predominates over the question whether Gurnee employees' claims should be subject to a different analysis. Furthermore, the legal question of the viability of Gurnee employees' claims can be resolved in one fell swoop, and will not require an individualized factual inquiry. Therefore, the single and uniform difference between Gurnee Drivers' and Helpers' travel and the rest of Averus's Drivers' and Helpers' travel does not undermine the fact that these claims can be adjudicated most efficiently on a class-wide basis.

experienced more financial harm than others as a consequence of this policy, and also that some class members may have a claim to greater back pay than others because of different statutes of limitations under different states' laws. However, individual questions with respect to damages only defeat certification if the class is unable to identify an efficient mechanism for establishing damages that corresponds with the "common theory of liability" certified for classwide treatment. *See, e.g.*, *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 88 (2d Cir. 2015). With respect to Averus's policy of refusing to pay legal wages and overtime—even in accordance with its own stated policies—Plaintiff anticipates being able to calculate damages based on only a few variables, including the class member's state and the number of weeks he was employed by Averus. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670-71 (7th Cir. 2015) ("[I]t may be sufficient to demonstrate that the defendant failed to pay overtime without assessing a full aggregate liability. There would be a common method for showing individual damages—a simple formula could be applied to each class member's employment records—and that would be sufficient for the predominance and superiority requirements to be met." (quoting *Newberg on Class Actions* § 12:2)).[8]

Predominance is not undermined because Plaintiff seeks to represent Drivers and Helpers protected by different states' laws. Multi-state wage-and-hour class actions are now commonplace.[9]  And, notwithstanding some differences in applicable laws,

---

[8] If the Court later determines that it would be too administratively difficult to determine damages arising from this policy on a classwide basis, it could decide to decertify this class, certify a "liability only" class under Federal Rule of Civil Procedure 24(c)(4), and then hold individualized damages hearings or damages hearings for different, later-certified subclasses. *See, e.g.*, *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014).

[9] *See, e.g.*, *Cardoza v. Bloomin' Brands, Inc.*, No. 2:13-CV-01820-JAD, 2015 WL 476182, at *1 (D. Nev. Feb. 5, 2015); *Craig v. Rite Aid Corp.*, No. 4:08-CV-2317, 2013

such actions can proceed as a single class if the plaintiffs' claims under various state laws are "susceptible to proof using common evidence." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 695 (S.D. Fla. 2004).

In this case, for the purpose of class certification, there are no legally relevant differences between applicable state laws. Proposed class members claims for wait-time pay under state law, for example, will turn on the common question of whether the Drivers and Helpers are "employed" during the periods that they wait at a customer site to start a new job. To resolve that issue under their own state wage-payment and wage-and-hour laws, all of the states where the members of the proposed class are based look to decisions and regulations interpreting the Fair Labor Standards Act, *see, e.g.*, 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time" under federal law), and rely in some form on the United States Supreme Court's test for calculating compensable wait time—namely, whether the employee is "engaged to wait" or "wait[ing] to be engaged," *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).[10]

---

WL 84928, at *1 (M.D. Pa. Jan. 7, 2013); *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2009 WL 2612307, at *1 (N.D. Cal. Aug. 24, 2009); *Cruz v. Hook-Superx, LLC*, No. 09 CIV. 7717, 2010 WL 3069558, at *3 (S.D.N.Y. Aug. 5, 2010) (collecting cases); *Wineland v. Casey's Gen. Stores, Inc.*, 267 F.R.D. 669, 675 (S.D. Iowa 2009).
[10] For Illinois law, see, for example, *Bernardi v. Vill. of N. Pekin*, 135 Ill. App. 3d 589, 592, 482 N.E.2d 101, 103 (1985) (relying on *Skidmore* to address compensability of wait time under state law); and Ill. Admin. Code tit. 56, § 210.110 (compensable time includes all hours during which an employee is "permitted to work" for the employer). For Indiana law, see, for example, *Gehbauer v. Emas, Inc.*, 679 N.E.2d 1374, 1376 (Ind. Ct. App. 1997) (affirming trial court that relied on *Skidmore* in determining whether on-call time was compensable under state law). For Missouri law, see, for example, *Hogan v. Kansas City*, 516 S.W.2d 805, 808 (Mo. Ct. App. 1974) (relying on factors to determine compensability of on-call time under the FLSA to determine compensability of firefighter "standby time" under state wage-and-hour law). For Colorado law, see, for example, 7 Colo. Code Regs. § 1103-1:2 (wait time is compensable under Colorado law if the employee is "suffered or permitted to work" during that time). For Minnesota law, see, for

Although there is considerably less authority regarding the compensability of travel time under applicable state laws, all of the relevant state laws make compensable travel time that is part of an employee's work, and look to basic employment law principles—embodied in federal law—to address the issue. *See, e.g.*, *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1882449, at *4 (N.D. Ill. Aug. 18, 2004) (relying on federal regulations interpreting the FLSA in deciding that employees' should be compensated under the FLSA *and* Illinois wage-and-hour law for time spent performing "preparation, travel, and cleanup work").[11]

_____

example, Minn. R. 5200.0120 (wait time is compensable under Minnesota law if employee is "involved in the performance of duties in connection with his employment"). For Wisconsin law, see, for example, Wisc. Admin. R. 272.12.2(b) ("Whether waiting time is time worked depends upon particular circumstances. The determination involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances. Facts may show that the employee was engaged to wait, or they may show that he/she waited to be engaged.").

[11] The Fair Labor Standards Act of 1938, as amended by the Portal-to-Portal Act of 1947, provides that employers are not required to compensate employees for "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a). The Supreme Court has clarified that an act is a "principal activity" of the employment if "it is an integral and indispensable part of the principal activities" of the employment. *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513, 517 (2014). Plaintiff does not concede that the provisions of the Portal-to-Portal Act and the Supreme Court's recent decision in *Integrity Staffing* necessarily apply to the proposed class members claims under state wage-and-hour laws. The Supreme Court arguably has interpreted the Portal-to-Portal Act to create an exception to the general rule that time spent while an employee "suffers or is permitted to work" is compensable under the FLSA. *See Dinkel v. MedStar Health Inc.*, No. CV 11-998(CKK), 2015 WL 5168006, at *8 (D.D.C. Sept. 1, 2015). If this is so, then a different analysis might apply to proposed class members' FLSA claims than their claims under state wage-and-hour law. *See, e.g.*, *id.* (concluding that the "integral and indispensable" test did not apply to plaintiffs' claims under District of Columbia law). But the potential divergence between state and federal law need not be resolved at this stage and does not defeat commonality or predominance. All of the state wage-and-

**B. Superiority**

A class action is also the superior method of resolving this controversy. To the knowledge of the named Plaintiff, no other potential class member has filed any claim in any court or administrative proceeding for unpaid wages against either of the Defendants. Avendano Decl. ¶ 12. Thus, no other potential class member has demonstrated an interest in controlling this litigation. *See* Fed. R. Civ. P. 23(b)(3)(A)-(B). Furthermore, the District of Colorado is ideal for the concentration of this litigation because all Defendants reside or do business in this District, and Plaintiff resides in this District. *See id.* 23(b)(3)(C). The putative class action is unlikely to be difficult to manage because underlying are Defendants' common policies regarding compensable worktime. *See id.* 23(b)(3)(D).

Finally, the class action vehicle is the superior method for adjudicating this controversy because it involves small claims of low-wage workers, most of whom lack English proficiency, and most of whom were paid at or near the minimum wage. Avendano Decl. ¶ 13; *see, e.g., Maez*, 268 F.R.D. at 397; *Cook v. Rockwell International Corp.,* 181 F.R.D. 473, 482 (D. Colo. 1998).

## IV.   THE COURT SHOULD CERTIFY THE CLASS BEFORE ADDRESSING PLAINTIFF'S STANDING TO ASSERT CLAIMS UNDER OTHER STATE LAWS

Plaintiff concedes that on his own he could not assert claims against Defendants for violations of the employment laws of states in which he did not work. The Court can and should nonetheless certify the proposed class and appoint Plaintiff as the class

---

hour laws track the FLSA in large part but do not include the express provisions of the Portal-to-Portal Act with respect to travel time. The legal question of the applicability of Portal-to-Portal Act case law to class members' state claims, then, can be decided by the Court in "one stroke" as well.

representative.

In *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA-BNB, 2011 WL 2791331 (D. Colo. July 14, 2011), this Court concluded that a plaintiff who had worked for the defendant in Colorado did not have "standing" to represent a proposed class asserting claims under the laws of states where the plaintiff had not worked. This analysis, the Court concluded, was "logically antecedent" to the question of whether the proposed class should be certified. *Id.* at *8.

Although the Court's analysis was consistent with other federal district court opinions, a number of courts recently have reached the opposite result. As one federal district court in Florida explained, dismissing putative class claims for lack of standing in contexts like this "would . . . impose a requirement that, in a multistate class action involving state . . . law claims, there be a named plaintiff from every state." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1231 (S.D. Fla. 2015). This result is inconsistent with "established practice," and "highly inefficient." *Id.*; *see also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213 (S.D.N.Y. 2012) (collecting cases and deciding to "join the courts in [the] growing consensus [to] find that class certification is logically antecedent to the issue of standing" in cases where the named plaintiff seeks to represent class members asserting claims under the laws of states where the named plaintiff does not reside or work).

The Court can certify this class, however, without having to reject its reasoning in *Smith v. Pizza Hut*. In this case, it is enough for the Court to recognize that its holding in *Pizza Hut* was animated by *prudential* standing concerns, and that those concerns should not apply to this case. For guidance, the Court should look to a recent decision from the Northern District of California, where the court engaged in a comprehensive analysis of the doctrinal issues at stake and concluded that courts "ha[ve] the *discretion*

to defer questions of standing until after class certification." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (Chen, *J.*) (emphasis added). The court ultimately decided to "require the Plaintiffs [in that case] to present a named class member who possesses individual standing to assert each state law's claims against Defendants." *Id.* But its reasoning supports Plaintiff's motion here.

The *In re Carrier IQ* court began by noting the "unremarkable proposition that for a class action to proceed between the named parties, each named plaintiff must have standing to sue at least one named defendant; to hold each defendant in the case, there must be at least one named plaintiff with standing to sue said defendant. Without such threshold standing, the case (or that portion of the case) could not proceed." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1069. In other words, to proceed to class certification, a putative class action must be (1) brought by plaintiffs who each have experienced an injury in fact that is concrete and particularized, actual and imminent, and likely redressable by a favorable decision, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); and (2) be brought against defendants each one of which is alleged to have caused the injury in fact of at least one named plaintiff. But, once a court is assured that a putative class meets these requirements, it "does no violence to Article III" to certify a class before considering whether the named plaintiffs could assert all of the proposed class members' claims if they were pursued in an individual action. *In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1073.  After all, if the class includes at least one member who has a claim under each of the state laws asserted by the class a "case or controversy [will] . . . be assured" the moment the class is certified. *Id.*; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (in settlement-approval context, courts may address certification before standing of individual class members); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) (same).

This Court's analysis in *Smith v. Pizza Hut* is consistent with the proposition that the issue at stake in that case was *prudential* standing, and not an absolute Article III bar to certifying a class action before considering the named plaintiff's standing to bring each of the claims of the putative class. The Court noted, for example, that *Ortiz* and *Amchem* "do not *require* courts to defer the standing analysis until after the class certification stage," but the Court appeared to assume that those cases and the principles upon which they are founded *authorize* courts to do so. Based on the particular facts of that case, the Court decided standing before certification because it was concerned about allowing the plaintiff to "engage in lengthy and expensive discovery with respect to alleged violations of state laws when the Court cannot be certain that any individual suffered an injury under those laws." *Smith v. Pizza Hut, Inc.*, 2011 WL 2791331 at *7, *9 (emphasis in original). The Court in *In re Carrier IQ*, declined to exercise its discretion to consider certification before standing based on similar concerns. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d. at 1074 ("The Court has reservations of subjecting the Device Manufacturers to the expense and burden of nationwide discovery without Plaintiffs first securing actual plaintiffs who clearly have standing.").

Those concerns are not applicable here. As an initial matter, Defendants waived any possible standing defense in this case by not raising that argument after Plaintiff filed his complaint seeking to represent a nationwide class asserting claims under various state laws. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1154 (10th Cir. 2014) ("Prudential standing doctrines are not jurisdictional: they may be forfeited or waived"). However, even if the Court decides to address the question, it should address certification before addressing Plaintiff's standing to assert claims under other states' laws. Unlike in *Smith v. Pizza Hut* and *In re Carrier IQ*, the parties have *already*

conducted discovery regarding class certification, and there is no dispute that members of the proposed class have standing to assert claims at least under the laws of Illinois, Indiana, Wisconsin, Missouri, Minnesota, and Colorado. Averus 30(b)(6) Dep. at 39-40 (explaining that Drivers and Helpers work out of those states).

Finally, and perhaps most importantly, the Court should certify the class before addressing standing in this case because of the characteristics of the members of the proposed class. Unlike *In re Carrier IQ*, this is not a sprawling consumer class action involving sophisticated class members. The members of the proposed class are low-wage, mainly immigrant workers who likely do not have much experience with the American legal system and may fear that their employer will retaliate against them for participating as a named plaintiff in this dispute. These employees may be deterred from serving as named plaintiffs, but they can effectively and efficiently achieve redress as absent class members through the claims processing and distribution process.  Hood Decl. ¶ 19. In cases like this, then, the requirement that there be a class representative who can individually assert each state claim raised by the putative class is particularly inefficient and harsh, and is only likely to insulate wrongdoers from liability for wrongful policies that stretch across state lines.

## V.    THE COURT SHOULD APPOINT PLAINTIFF'S COUNSEL AS CLASS COUNSEL

Should the Court grant Plaintiff's motion, it must appoint class counsel. Fed. R. Civ. Proc. 23(g). Plaintiffs' counsel, Alexander Hood and David Seligman (attorneys at Towards Justice), request appointment as class counsel.

Mr. Avendano came to Towards Justice through Towards Justice's intake at a workers' center in downtown Denver. Towards Justice's paralegal initially spent considerable time performing an initial intake and gathering documents from Mr.

Avendano. Attorney Hood has invested at least 50 hours in identifying and investigating potential claims in the action. *See* Hood Decl. ¶¶ 6-7. Attorney Seligman has spent at least 20 hours investigating this case and researching issues related to this motion. Ex. 3 Seligman Decl. ¶ 6 (hereinafter, "Seligman Decl.").

Towards Justice is a Colorado non-profit legal organization dedicated to representing low wage workers. Hood Decl. ¶ 8. Mr. Hood, Towards Justice's Director of Litigation, is currently litigating or has litigated multiple other wage-and-hour cases in the District of Colorado, including a number of class and collective actions. Hood Decl. ¶¶ 9-10. Mr. Seligman recently joined Towards Justice as a staff attorney. Mr. Seligman has researched and written on a number of topics related to class actions and class certification and attended a three-day "Class Action Training Institute" hosted by experienced class action practitioners from the Impact Fund. Seligman Decl. ¶¶ 3-4.

## C. Resources Committed to Representing the Class

Towards Justice has committed to advancing all costs of this litigation, including the cost of issuing the class notice.

## VI.   CONCLUSION

Plaintiff requests the following:

1. That the Court certify a class of current and former Drivers and Helpers working out of Averus's branches in Colorado, Illinois, Indiana, Minnesota, Missouri, and Wisconsin to challenge the three company-wide policies identified by Plaintiff here under these states' wage-and-hour and wage-payment laws.

2. That, in the alternative, the Court certify the above class to challenge Averus's company-wide travel-time and wait-time policies and certify a subclass of current and former Drivers and Helpers working out of Averus's Colorado branch corresponding with the already certified FLSA opt-in class action certified by this Court in March 2015.

3. That Alfonso Avendano be named class representative of any of the classes certified by the Court;

24

**4.** That Alexander Hood and David Seligman be named class counsel.

 Dated: October 30, 2015

         Respectfully Submitted,

         <u>s/Alexander Hood</u>
         Alexander Hood
         Towards Justice
         1535 High Street, Suite 300
         Denver, CO 80218
         Tel.: 720-239-2606
         Fax: 303-957-2289
         Email: alex@towardsjustice.org

         <u>s/David Seligman</u>
         David Seligman
         Towards Justice
         1535 High Street, Suite 300
         Denver, CO 80218
         Tel.: 720-248-8426
         Fax: 303-957-2289
         Email: david@towardsjustice.org

         Attorneys for the Plaintiff

**Certificate of Service**

I hereby certify that on October 30, 2015, I served a true and correct copy of the forgoing on the individuals below pursuant to F.R.C.P. 5.

*Attorneys for Defendants*
Antonio Caldarone
Amy L. Miletich
Brendan Benson

 s/ Alexander Hood
Alexander Hood