**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-01614-CMA-MJW

ALFONSO AVENDANO, on behalf of himself and others similarly situated,

      Plaintiff,

v.

AVERUS, INC., and
MICHAEL SHANK,

      Defendants.

---

**ORDER GRANTING SECOND MOTION FOR CONDITIONAL CERTIFICATION OF A
NATIONWISE FLSA CLASS UNDER SECTION 216(b) OF THE FAIR LABOR
STANDARDS ACT**

---

      This matter is before the Court on Plaintiff's Motion for Conditional Certification of

a Nationwide FLSA Class Under Section 216(b) of the Fair Labor Standards Act.  (Doc.

# 70.)  For the reasons provided below, the Court grants the Motion.

## I. <u>BACKGROUND AND PROCEDURAL HISTORY</u>[1]

      Defendant Averus Inc. (Averus) provides maintenance and fire protection

services to restaurants, bars, and hotels in several states, including kitchen exhaust and

oven cleaning services.  (Doc. # 34-1 at ¶ 5.)  Averus' corporate office is located in

Gurnee, Illinois, and the company has seven branch offices in six states (Gurnee,

---

[1] Extensive factual background was provided in the Court's initial Order granting in part and
denying in part Plaintiff's Motion to certify a collective action under the Fair Labor Standards Act
(FLSA), 29 U.S.C. § 216(b), (Doc. # 51 at 1–6), and will be reiterated here only to the extent
necessary to address the instant Motion.

Illinois; Denver, Colorado; Indianapolis, Indiana; St. Paul, Minnesota; Kansas City, Missouri; St. Louis, Missouri; and Nashville, Tennessee).  (*Id.*)  Averus also employs drivers who operate out of Milwaukee, Wisconsin, but that location does not have a branch office or other type of "home base" for employees.  (Doc. # 69-1 at 38:17-25, 39:1-11.)

Plaintiff, Alfonso Avendano, was a non-exempt hourly employee and worked as a "Lead Service Technician" ("Driver") for the Denver branch of Averus.  Throughout his tenure with Averus, Plaintiff drove with a "Service Technician" ("Helper") in his employer-issued van.  (Doc. # 41-1 at 3.)  The van was outfitted with professional cleaning equipment and cleaning supplies – specifically, a large diesel heater and water pump bolted in the back, immediately behind the front seats.  (Doc. # 34-1 at ¶ 4.)  The two-person Driver and Helper team would arrive at an Averus client's location and attach hoses to this equipment in the van, using the hoses to spray heated, pressurized cleaning fluid onto oven hood and vent exhaust systems at restaurants and other job sites, in both Colorado and neighboring states.  (*Id.*)  Because Averus' customers were restaurants and other customer facilities, the Drivers and Helpers generally did their cleaning work throughout the night, when those restaurants and other customer facilities were closed to the public.  (Doc. # 71-1 at 17:14-18.)  Plaintiff was paid $10.00 an hour for this work.  (Doc. # 34-1 at ¶ 5.)  He was directly supervised by Michael Shank, then-Branch Manager of Averus' Denver location.  (*Id.*)  Averus currently employs eight full-time Drivers and Helpers at its Denver branch, and 64 Drivers and Helpers at its other branches.  (*Id.* at ¶ 11.)

On March 31, 2015, the Court granted in part and denied in part Plaintiff's Motion to certify a collective action under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b). (Doc. # 51.) The Court concluded that Plaintiff had proffered "substantial allegations" that Drivers and Helpers who worked in Averus' Denver location and who were supervised by Michael Shank had been exposed to common, company-wide policies with respect to the failure to pay minimum wages and overtime. (Doc. # 51 at 15.) However, because Plaintiff's evidence regarding Averus' practices was limited to the Denver branch, and because Plaintiff failed to proffer evidence that Mr. Shank had the authority to set policies for Averus beyond that particular branch, the Court concluded that Plaintiff failed to proffer "substantial allegations" of wage violations at Averus' other branch locations. (*Id.* at 14–18.) Accordingly, it granted Plaintiff's Motion for certification with respect to the Denver-specific class, but denied it with respect to the "national" class. (*Id.*) The Court's Order also denied Plaintiff's Motion – without prejudice – with respect to the issue of whether Plaintiff had shown "substantial allegations" regarding Averus' policy regarding the compensability of driving time, i.e., the time Drivers and Helpers spent driving to customer locations. (Doc. # 51 at 18, n. 6.) Its primary rationale for doing so was that this travel-time policy was "not one for which Plaintiff sought certification in the initial certification motion." (*Id.*)[2]

---

[2] Although Plaintiff's Motion made passing references to the fact that Averus had a policy that failed to compensate "employees at all for time spent driving to and from customer locations," (Doc. # 16 at 7), the primary discussion about the legalities of the driving time policy appeared in Plaintiff's Reply brief in support of Plaintiff's Motion (as well as both parties' surreplies); indeed, Plaintiff's Reply was the first time that Mr. Avendano submitted evidence (in the form of a declaration) detailing the kinds of equipment in the vans. (*Compare* Doc. # 16-1 at 2-3 *to* Doc. # 41-1 at 2, ¶ 4.) Moreover, discovery has revealed additional details about Defendant's drive-

In the instant Motion, Plaintiff again requests that this court conditionally certify a "national" class of Averus employees[3] – specifically, "all people currently or formerly employed" as Drivers and Helpers in Averus Inc.'s Kitchen Cleaning Exhaust Division. (Doc. # 70 at 6.)  In particular, Plaintiff alleges that these employees have been exposed to two common, unlawful policies, implemented on a "national" level, warranting class certification.  First, Plaintiff alleges that Averus has an unlawful policy with regard to the compensability of so-called "wait time" – i.e., a policy providing that Drivers and Helpers are not paid for any of the time they spend waiting to actually begin their cleaning work at a client location, if this wait time extends beyond a 30-minute paid break.  (*Id.* at 4.)[4]  Second, Plaintiff also alleges that Averus has an unlawful policy with regard to the compensability of Driver and Helper "drive time" at the beginning and the end of employee shifts.  (*Id.* at 5.)  Although Drivers and Helpers are compensated for the time it takes them to drive from one client to another **during** a particular shift, the

_____

time policy.  Accordingly, for reasons discussed in greater detail below, the Court revisits this issue here.

[3] Although the Plaintiff characterizes this as a "national" class and their proposed class description/definition does not limit the class to a particular geographic area (*see* Doc. # 70 at 6), as previously mentioned, Averus Inc. has only eight branches in seven states: Gurnee, Denver, Kansas City, St. Louis, Indianapolis, Nashville, St. Paul, and Milwaukee.  (Doc. # 70-1 at 38:1-25.).  The Court further notes that Mr. Shank, Defendant's Rule 30(b)(6) designee, stated that, when he was speaking about Averus' national policies, he was referring to these eight Averus branches.  (Doc. # 70-1 at 38:17-25.)  He also explained that there are other Averus locations that "license" the Averus name, but "[w]e don't have any guidelines on how the[se licensed businesses] run, who they work with, what they do, what they buy, anything like that.  We work for our corporation, they do whatever they want."  (*Id.* at 38:1-15.)  Thus, when the Court refers to Averus' "national branches," or to a "national policy," it is referring to the eight Averus Inc.-specific branches (Gurnee, Denver, Kansas City, St. Louis, Indianapolis, Nashville, St. Paul, and Milwaukee), not to these other "licensed branches," which are not parties to the instant case.

[4] This "wait time" policy was not one for which Plaintiff originally sought certification.  (*See* Doc. # 16.)

time that the Driver (and Helper) spend driving in an Averus-equipped van at the **beginning** of their shift – i.e., the time spent driving from the Driver's home/the Helper's pickup location to the first Averus customer – is only compensable to the extent that it exceeds one hour.  (*Id.*)  Likewise, after providing cleaning services for their final client of the day, Drivers and Helpers are not paid for the time they spend driving home, unless that drive time exceeds one hour, and only to the extent that it exceeds one hour.  (*Id.*)

In connection with the instant Motion, Plaintiff also seeks approval of a form of notice advising employees of their right to opt-in to the action, and authorizing the sending and/or posting of such notice to putative members of the proposed collective action.  (*Id.* at 13; Doc. # 70-3.)

## II.  ANALYSIS

### A.  Whether the Court Can Consider Multiple Motions for Class Certification

Prior to discussing the merits of Plaintiff's Motion, the Court must consider whether it can hear it.  Plaintiff brings this Motion because he obtained additional evidence that is critical to establishing a common Averus policy with respect to wait-time and drive-time claims, but only obtained this evidence **after** filing the initial motion for class certification on July 10, 2014.  (Doc. # 16.)  Specifically, that initial motion did not contain evidence from the deposition of Michael Shank, Averus' corporate representative under Rule 30(b)(6), because Mr. Shank's deposition occurred on March 13, 2015 – approximately eight months **after** Plaintiff filed his initial motion for class certification in July of 2014.  (Doc. ## 16, 69-1 at 7.)  Mr. Shank was promoted to a

"Regional Manager" for multiple Averus branches in 2014; Averus described him as an individual with "knowledge relating to how Averus records hours worked by Lead Service Technicians and Service Technicians, **Averus' time keeping and travel time policies**, . . . [and] how Averus generally calculates hours worked by Lead Service Technicians and Service Technicians."  (Doc. # 76-5 at 8) (emphasis added).  As discussed below, Mr. Shank did provide evidence regarding Averus' policies with respect to "travel time" and "wait time" at Averus' other branches during his deposition.  Accordingly, in light of Mr. Shank's deposition, Averus is simply incorrect when it asserts that "the evidence and allegations made by Plaintiff when he originally sought certification of a national class **are no different now.**"  (Doc. # 70 at 1) (emphasis added).

Although the Court would have preferred, for the sake of efficiency, that Plaintiff had filed his earlier certification Motion **after** this critical deposition occurred, it recognizes the reality that discovery was ongoing in this case and that the deposition not only establishes that Averus had a national policy, it also fills in critical details.  In these circumstances, it makes sense for the Court to consider whether Mr. Shank's testimony indicates that Averus in fact had common policies or practices that extended beyond its Denver branch to its other corporate branches.  Thus, although Averus argues that the Court is not permitted to "modify" its prior class certification order under Rule 60 of the Federal Rules of Civil Procedure, it provides no legal authority indicating that multiple certification motions are prohibited, particularly when, as here, discovery is ongoing and the new motion is based on new evidence, and Plaintiff complied with the

Court's scheduling order, dated October 20, 2015, in which the Court ordered that all Motions for Class Certification were due by October 30, 2015.  (*See* Doc. # 66.) Moreover, as Plaintiff notes, there is nothing in the FLSA that precludes the Court from considering multiple motions for conditional certification of an FLSA class, and other Courts have considered multiple motions for certification in both the FLSA and Rule 23 contexts.  Indeed, "it is not uncommon for district courts to permit renewed certification motions that set out a narrower class definition or that rely upon different evidence or legal theories."  *Hartman v. United Bank Card, Inc.,* 291 F.R.D. 591, 597 (W.D. Wash. 2013).  *See, e.g.*, *Bushbeck v. Chicago Title Ins. Co.*, No. C08–0755JLR, 2012 WL 405173, at *2 (W.D. Wash. Feb. 8, 2012) (allowing for renewed motion for class certification as to a class that was more limited in terms of geography and claims); *Dunbar v. Google, Inc.*, No. 5:12-CV-003305-LHK, 2012 WL 6202797, at *4 (N.D. Cal. Dec. 12, 2012) (considering a second motion for class certification notwithstanding an earlier denial of the first motion without prejudice, because plaintiffs were able to proffer strategies for correcting the deficiencies in the prior motion); *Rosales v. El Rancho Farms*, No. CIV-F-09-0707 AWI, 2012 WL 2684979, at *5 (E.D. Cal. July 6, 2012) (considering a second motion for class certification after denying initial motion, though characterizing the former as a motion for reconsideration).  Accordingly, the Court finds it is appropriate to consider the instant Motion.

## B.  The Standard for Section 216(b) Certification

Section 216(b) of the FLSA provides a unique procedural mechanism allowing "collective" actions for minimum wage and/or overtime violations.  Such actions "may be

maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. 216(b). Unlike class actions under Rule 23 of the Federal Rules of Civil Procedure,[5] a "collective class" under the FLSA includes only those individuals who expressly opt in to the class in writing. *Id.*

The Tenth Circuit has approved of the use of a two-step process for determining whether putative employees are "similarly situated" to the named plaintiff(s) for purposes of Section 216(b). *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102-1105 (10th Cir. 2001) (approving of the so-called "ad hoc," two-step approach and describing it is as "arguably . . . the best" approach for 216(b) actions, because "it is not tied to the rule 23 standards.")[6]

During the "first stage," the Court makes an initial, so-called "Notice" determination of whether the named plaintiff(s) and the proposed opt-in class are

---

[5] Plaintiff has also applied for class certification under Rule 23. (*See* Doc. # 69.)

[6] The Court recognizes that several legal scholars and eminent jurists have argued that requiring this type of "certification" in Section 216(b) cases is analytically suspect, and even antithetical to the remedial purposes of the FLSA. *See, e.g.,* Scott A. Moss, Nantiya Ruan, *The Second-Class Class Action: How Courts Thwart Wage Rights by Misapplying Class Action Rules* ("*Second-Class Class Action*"), 61 Am. U. L. Rev. 523 (2012); Allan G. King, Camille C. Ozumba, *Strange Fiction: The "Class Certification" Decision in FLSA Collective Actions* ("*Strange Fiction*"), 24 Lab. Law. 267 (2009); *Turner v. Chipotle Mexican Grill, Inc.*, 123 F. Supp. 3d 1300, 1309 (D. Colo. 2015) (Kane, J.) (citing *Second-Class Class Action* and *Strange Fiction*, and concluding that "certification" is an inappropriate way to deal with Section 216(b) cases; "Rather than subject [claimants] to heightened pleading standards or evidentiary burdens of proving commonality . . . the letter and spirit of § 216(b) suggests handling them as any other challenge to a Rule 20 joinder in an existing plaintiff's claims. Rule 21 (misjoinder) and Rule 42 (severance) are the proper vehicles for challenging individual plaintiffs in an FLSA collective action"). Nevertheless, in light of the fact that the standard is Tenth Circuit precedent, and because Plaintiff would prevail under either standard, the Court applies the certification standard outlined in *Thiessen*, 267 F.3d at 1102.

"similarly situated." *Id.* at 1102-03.  In particular, during the first stage, the district court determines whether a collective action should be certified for purposes of sending notice of the action to potential class members. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995).  This "'require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Thiessen*, 267 F.3d at 1102 (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)).  At this stage, "a court need only consider the substantial allegations of the complaint along with any supporting affidavits or declarations." *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA, 2012 WL 1414325 at *3 (D. Colo. Apr. 21, 2012) (citation omitted).  Additionally, in making the decision as to conditional certification, "the court does not weigh evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims." *Id.*  Moreover, the standard at the Notice juncture is a "fairly lenient" one, and usually results in conditional certification. *Thiessen,* 267 F.3d at 1103 (describing the standard as "fairly lenient"); *Mooney*, 54 F.3d at 1214 ("Because the court has minimal evidence, [the notice-stage] determination . . . typically results in 'conditional certification' of a representative class"); *Renfro v. Spartan Computer Servs., Inc.*, 243 F.R.D. 431, 432 (D. Kan. 2007) (same); *Williams v. Sprint/Un. Management Co.*, 222 F.R.D. 483, 485 (D. Kan. 2004) (same). Moreover, the "similarly situated" standard is considerably less stringent than Rule 23(b)(3)'s class action standards. *Pegues v. CareCentrix, Inc.*, 12-2484-CM, 2013 WL 1896994, at *1 (D. Kan. May 6, 2013) (citing *Grayson v. K–Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)).

If the district court "conditionally certifies" the class during the first stage, putative class members are provided with court-approved notice and the opportunity to opt in to the action, and the matter proceeds as a representative action throughout discovery. *Hoffman–La Roche Inc. v. Sperling*, 493 U.S. 164, 170-71 (1989); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001).

At the conclusion of discovery – often prompted by a motion to decertify by the defendant – the Court makes a second determination, utilizing a stricter "similarly situated" standard. *Thiessen*, 267 F.3d at 1102-03; *Vaszlavik*, 175 F.R.D. at 678. During this "second stage," the Court analyzes several factors, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) whether Plaintiff made any requisite statutory filings before bringing suit. *Id.* at 1103.

### C.  Application: Averus' Common "Wait Time" Policy

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work" – though the FLSA does not define "work."  29 U.S.C. § 203(g); *see also* 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.'  The act, however, contains no definition of 'work.'").  Over seventy years ago, the Supreme Court established that "no principle of law . . . precludes waiting time from also being working time," such that an employee who is "engaged to wait" must be compensated, even though an employee "wait[ing] to be engaged" need not.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 136–37 (1944).  Thus, if an employee is

required to remain on the employer's premises "or so close thereto that he [or she]

cannot use the time effectively for his own purposes," he or she is considered "on call"

and must be compensated, whereas "[a]n employee who is not required to remain on

the employer's premises but is merely required to leave word at his home or with

company officials where he may be reached is not working while on call" is not required

to be compensated.  29 C.F.R. § 785.17.[7]  Additionally, when periods of inactivity are

"unpredictable" and "usually of short duration," and the employee "is unable to use the

time effectively for his own purposes," then the employee is "engaged to wait," and the

inactive time typically constitutes compensable, i.e., "work" time, under the FLSA.  29

C.F.R. § 785.15.  By contrast:

> Periods during which an employee is **completely relieved from duty** and
> **which are long enough to enable him to use the time effectively for**
> **his own purposes are not hours worked**.  **[The employee] is not**
> **completely relieved from duty and cannot use the time effectively for**
> **his own purposes unless he is definitely told in advance that he may**
> **leave the job and that he will not have to commence work until a**
> **definitely specified hour has arrived.**  Whether the time is long enough
> to enable him to use the time effectively for his own purposes depends
> upon all of the facts and circumstances of the case.

29 C.F.R. § 785.16 (emphasis added).  In such circumstances, the employee is "waiting

to be engaged."  For example,

> A stenographer who reads a book while waiting for dictation, a messenger
> who works a crossword puzzle while awaiting assignments, [a] fireman
> who plays checkers while waiting for alarms and a factory worker who
> talks to his fellow employees while waiting for machinery to be repaired

---

[7] Department of Labor regulations "lend insight into the determination of what constitutes
compensable time."  *Gilligan v. City of Emporia, Kan.*, 986 F.2d 410, 412 (10th Cir.
1993).

> are all working during their periods of inactivity.  The rule also applies to employees who work away from the plant.  **For example, a repair man is working while he waits for his employer's customer to get the premises in readiness.  The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity.**  The periods during which these occur are unpredictable.  They are usually of short duration.  In either event the employee is unable to use the time effectively for his own purposes.  It belongs to and is controlled by the employer.  In all of these cases waiting is an integral part of the job.  The employee is engaged to wait.

C.F.R. § 785.15 (emphasis added).  The Department of Labor has also explained that

> Waiting before the time established for the commencement of work would be regarded as a preliminary activity when the employee voluntarily arrives at his place of employment earlier than he is either required or expected to arrive.  Where, however, an employee is required by his employer to report at a particular hour at his workbench or other place where he performs his principal activity, if the employee is there at that hour ready and willing to work but for some reason beyond his control there is no work for him to perform until some time has elapsed, waiting for work would be an integral part of the employee's principal activities.

29 C.F.R. § 790.7.

Each case, however, is fact-specific: "Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all the facts and circumstances of the case," such as the "nature of the service, and its relation to the waiting time."  29 C.F.R. §§ 785.14, 785.16; s*ee also Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1132 (10th Cir. 2000) (quoting *Boehm v. Kansas City Power & Light Co.*, 868 F.2d 1182, 1185 (10th Cir. 1989)) ("Necessarily, the inquiry is highly individualized and fact-based, and 'requires consideration of the agreement between the parties, the nature and extent of the restrictions, the relationship between the services rendered and the on-call time, and all surrounding circumstances.' . . . [A]s well as the degree to which the burden on the employee interferes with his or her personal

pursuits.")  Additionally, the relevant inquiry is not whether the employees' duties prevented them from engaging in any and all personal activities; rather, it is whether the time spent waiting is predominantly for the employer's benefit or the employees'. *Armour*, 323 U.S. at 133, 132–34 (holding as compensable time firefighting employees spent "playing cards and other amusements, or in idleness" while engaged to wait); *see also Donovan v. 75 Truck Stop, Inc.*, No. 80–9–CIV–OC, 1981 WL 2333, at *12, (M.D. Fla. July 20, 1981) (holding that even if truck washers had been permitted "to go across the street to go swimming at the Days Inn, this would not have been sufficient to relieve the employer from his responsibility to compensate them during such periods . . . because the employees were expected to be available to commence work immediately upon arrival of a truck").

Plaintiff argues that Mr. Shank's testimony establishes that Averus had a common, unlawful policy of failing to pay Drivers and Helpers for all of the time they spend waiting at customer sites until they actually begin cleaning at a particular client site.  (Doc. # 70 at 4, 7.)  Averus does not dispute that this time (to the extent it exceeded 30 minutes) was unpaid; instead, it counters that this policy was lawful, arguing that employees were completely relieved from their duties while waiting to begin cleaning and were free to do as they wished: "[Mr.] Shank testified that **Averus' nationwide policy was that employees were free to spend their time during breaks of more than thirty minutes** . . . **to engage in personal activities**, including shopping, sleeping, eating, and reading."  (Doc. # 77 at 5) (emphasis added).  Averus also argues

that Plaintiff still cannot show that this was a "national" policy, i.e., one that applied to

employees at all seven Averus branches.  (*Id.*)

Mr. Shank testified as follows when asked the following questions by Plaintiff's

counsel regarding Averus' national policy regarding the use of Averus' work vans:

> **Q:**   So I'm assuming that Averus has some policies about they've [sic]
> given vans to these drivers and driver/helper teams, they keep
> them at their homes -- well, at the driver's home, generally, I would
> think?
> **A:**   Right.
> **Q:**   And I'm assuming they're not allowed to use the van for whatever
> they want?
> **A:**   Correct.
> **Q:**   **So what can they and can't they use the van for?**
> **A:**   **They are instructed to use the van per company policy to go to
> and from work, in between jobs, to the warehouse and/or
> storage unit, and directly home.  They are not to use it
> anything [sic] outside of that scope.**
> **Q:**   **So if, say, Mr. Avendano was, hypothetically, cleaning an
> [oven] hood at a restaurant in Boulder and his next job was in
> Longmont, but there were three hours between the Boulder job
> and the Longmont job, could he drive home in between and
> drive back to the Longmont job?**
> **A:**   Could he? Yes.
> **Q:**   **That would be permitted by Averus policy?**
> **A:**   **No.  Not by policy.  He could.  It's up to him to do it.  By our
> policy, they are to go from point A to point B, per job
> assignment, and take the time to get there.**

(Doc. # 69-1 at 24:8-25, 25:1-9.)  This line of questioning did not raise an objection from

Averus' attorney.  On redirect, Averus' lawyer asked Mr. Shank the following:

> **Q:**   But outside of that compensable travel time [from one client
> location to another], **if there was an additional gap of time of
> greater than 30 minutes – think the example that was given
> was two or three hours, that time – would that time be
> compensated?**
> **A:**   **No.**

> **Q:** **And during that time, <u>what was the company's policy</u> <u>as to</u> <u>what drivers and helpers were able to do during that two- or</u> <u>three-hour gap time?</u>
>
> **A:** **That was considered free time for the employee.  Non-work** **time. They could go shopping.  As long as they didn't put the** **company vehicle or the company at risk.**
>
> **Q:** **So could they sleep in their vans?**
>
> **A:** **Oh, yes.**
>
> **Q:** **Were you aware of employees doing that?**
>
> **A:** **Absolutely.**
>
> **Q:** **Could they eat?**
>
> **A:** **Yes.**
>
> **Q:** **Could they read?**
>
> **A:** **Yes.**
>
> **Q:** **Could they go home?**
>
> **A:** **Yes.**
>
> **Q:** Now, you -- there were some questions about arriving at a job and there was some delay in beginning the job not as a result of the company's fault.  Let's say a customer wasn't ready and a crew had to wait until the customer -- you know, the crew arrived on time, there was some delay because the customer wasn't ready/was not there.  How would -- what was the company's policy on how that time was treated as compensable?
>
> **A:** **As long as the employee checked in with the manager and** **started any type of work, they were compensated as long as** **they reported that.  That means unloading their truck, putting** **the ladder up, any basic thing and they reported that time, it** **was paid.**

(*Id.* at 65:21-25, 66:1-25, 67:1-7) (emphasis added).

When Plaintiff's attorney asked for clarification about what Drivers and Helpers were, in fact, permitted to do while waiting, Mr. Shank testified as follows (again, without objection from Averus' attorney):

> **Q:** [B]ack to the Boulder/Longmont example.  When we discussed that earlier, **I asked you specifically whether or not during the two-** **or three-hour gap the drivers and helpers could go home and** **you said no.  Your attorney just asked you whether or not the** **drivers and helpers could go home during this hypothetical** **two-hour gap and you said yes.**  So I'm confused.  Which is it, yes or no?

> **A:** **If you're using the word "could go home," yeah, they could go home.  Was it company policy?  No.  But they could do whatever they want.  It's very frowned upon, meaning it's a waste of company resources.**
>
> **Q:** **Right.  So, I mean, the way you explained it before is that they could go home, just like a meteor could hit me right now.**
>
> **A:** **Well, yeah.**
>
> **Q:** But that it was against company policy for them to go home because they would burn a bunch of gas?
>
> **A:** Right.  Sorry.  Yes.  Correct. . . .
>
> **Q:** So yes?
>
> **A:** Yes.
>
> **Q:** **Thank you.  Because, theoretically, an employee could do anything at any given moment, but that doesn't mean that that thing they do isn't violating company policy, correct?**
>
> **A:** **Correct.**

(Doc. # 69-1 at 67:24-25, 68:1-25, 69:1-2) (emphasis added).

Averus' counsel also asked Mr. Shank the following questions about Averus'

disciplinary policies if an employee went home while waiting at a customer site:

> **Q:** Within a normal commuting distance, okay, if an employee had a large gap of time -- you know, I understand -- I understand that if the employee had a gap of time in Cheyenne it would be a problem to drive back home to Aurora, let's say.  But let's say it's not an over-the-road, over-the-night trip, or outside of what would be the normal, regular service area, okay, and an employee had a large gap of time, **would they be disciplined for going home and – during that gap of time?**
>
> **A:** **Yes.  In the form of a conversation.  Yeah, we would highly recommend that they don't do it.  And if it became a problem, then it would be a written warning.**
>
> **Q:** Have you ever disciplined anyone for that?
>
> **A:** No.
>
> **Q:** **Are you aware when you were a branch manager that employees did go home during this gap time?**
>
> **A:** **Yes.**
>
> **Q:** **And did you discipline them for it?**
>
> **A:** **Yes.**

(*Id.* at 70:13-25, 71:1-9) (emphasis added).

After reviewing his deposition, Mr. Shank submitted an "Amendment to
Deposition" ("Amendment"), regarding page 68, lines 19, 20, and 22 (in which Mr.
Shank confirmed that "it was against company policy for [employees] to go home [while
waiting for a customer] because they would burn a bunch of gas") and page 71, lines 7
and 9 (in which Mr. Shank confirmed that he was "aware when[he] was a branch
manager that employees did go home during this gap [wait] time" and that he had
disciplined those employees for doing so).  (Doc. # 69-1 at 99.)  Mr. Shank's
"Amendment" stated the following regarding these portions of his deposition: **"This
answer was made in my individual capacity as the branch manager of the Denver
location and my answer was limited to my practices at the Denver location**.  The
answer doesn't apply to [illegible] locations and **my answer wasn't made as corporate
representative of Averus Inc. under Rule 30(b)(6)**." (*Id.*) (emphasis added).  Mr.
Shank also provided the following explanation regarding his changed answers:  "I was
confused because some questions answered during the deposition testimony were
about my practice in Denver and other questions were about company-wide practices.  I
answered the question regarding my practice in Denver and I should have clarified that
it was not a company-wide practice." (*Id.*)

The Court finds that although the 30(b)(6) deposition was far from the model of
clarity,[8] the testimony quoted above provides "sufficient allegations" that Averus did, in

---

[8] Unfortunately, even after this deposition (and several declarations filed in this case by Plaintiff
Avendano), some questions remain unanswered regarding details of the wait-time policy, and
the Court is hopeful that these questions will be resolved prior to the "second stage" of class
discovery.  For example, Plaintiff's counsel did not ask whether Mr. Shank's extremely limited
and idiosyncratic definition for the word "could" also applied to the other activities he mentioned

fact, have a national policy whereby employees who were waiting at customer sites were not "completely relieved from duty" for periods that were "long enough to enable [the employees] to use the time effectively for [their] own purposes."  29 C.F.R. §§ 785.15, 785.16.  Mr. Shank appeared at the deposition as Averus' 30(b)(6) designee, and Averus specifically represented that he had knowledge regarding "Averus' time keeping and travel time policies."  (Doc. # 76-5 at 9.)  Mr. Shank also acknowledged that he was appearing as a Rule 30(b)(6) representative for Averus at the deposition, and that as such, he was "to testify about information known or reasonably available to the organization at the time of the deposition."  (Doc. # 69-1 at 6:18-25, 7:1-3.) Although Mr. Shank's deposition "Amendment" states that he should have limited his answers about Averus' policy prohibiting employees **for going home during their wait time** to the Denver location specifically, the Amendment does not apply to Mr. Shank's earlier answers, in which he definitively stated – without drawing any sort of objection from Averus' counsel – that employees are permitted to use Averus-issued work vans

that employees "could" do during their wait times, such as shopping, sleeping, reading, or eating – i.e., that an employee **technically** "could" do something, but that it was not actually permissible under Averus' policy/workplace rules (and, indeed, could result in discipline).  Nor did Plaintiff's counsel ask whether Drivers and Helpers could predict the length of time they would be required to wait before a customer was ready.  On a related note, it is also impossible to tell **how** employees are notified that a customer is ready, and whether employees would be expected to begin work immediately upon a customer becoming ready, or if they had some additional "buffer time," for example, 30 minutes, to return to the customer site.  Plaintiff has stated that "[b]ased on my understanding, **other than rare occasions** when Michael Shank told me to use the van for something else, **I was not allowed to use the van for any purpose other than driving from home to worksites, then between worksites, and then from worksites to Averus's Denver branch home at the end of a shift.**"  (Doc. # 70-2 at 1, ¶ 5) (emphasis added).  Mr. Avendano has also stated that, "**I did not think of the time waiting at restaurants to be break time.  I was not allowed to leave the customer site or use this time for my personal purposes**, and because I knew that I would have to arrive at the next restaurant site on time, **I often used this time to prepare my equipment**." (Doc. # 70-2 at 1, ¶ 10) (emphasis added).

for driving to work, between jobs, to and from the warehouse/storage unit, and directly

home, but that they were "not to use [the van] [for] anything outside of that scope." (*Id.*

at 24:18-22.)  Nor did Mr. Shank amend his answer to Plaintiff counsel's earlier question

– which also raised no objection from defense counsel – regarding Averus' policy as to

whether employees were permitted to go home during their waiting time, when Mr.

Shank explicitly stated that, although an employee **technically "could"** go home,

Averus' national policy did not permit him to do so ("Not by policy.  He could [go home].

It's up to him to do it.  By our policy, they are to go from point A to point B, per job

assignment, and take the time to get there.")  (*Id.* at 25:6-9.)

Averus' counsel accuses Plaintiff of "twist[ing] Mr. Shank's testimony about his

personal practice into a company-wide practice," and notes that that Mr. Shank

> testified in both his personal capacity and as a corporate representative
> under Rule 30(b)(6).  **Defendants' counsel made a number of**
> **objections to questions that were beyond the scope of the subjects**
> **for which Shank was identified.**  Shank, therefore, responded to those
> questions only in his personal capacity.  **The factual allegations**
> **regarding whether employees were allowed to go home during wait**
> **time of more than thirty minutes was not a company-wide practice or**
> **policy, but was Shank's practice**.

(Doc. # 77 at 5) (emphasis added).  The Court is very much puzzled by Defendants'

assertions.  The Court painstakingly reviewed both Mr. Shank's Amendment to his

deposition and the deposition itself, and although defense counsel objected repeatedly

on the basis that particular questions were beyond the scope of Mr. Shank's Rule

30(b)(6) designation, such objections **were not made with regard to questions**

**relating to Averus' wait time policies.**[9]  Defendants lose credibility with the Court

when they make statements that are contrary to the record.

In sum, then, Mr. Shank testified that once Averus employees arrive at the

customer site, if they are required to wait before beginning their cleaning job, Averus'

national policies provide that (1) they are not compensated for this waiting time (beyond

a 30 minute break), and (2) they are not permitted to use Averus-issued vans for

personal uses, drive them anywhere else until the job is completed, or drive the vans

home during breaks.  Although Mr. Shank testified that wait time is considered

"employee free time," and that employees "could" shop, eat, read, or sleep during

breaks, the Court finds that Plaintiff has met its burden to show "substantial allegations"

that Averus had a common, national policy that restricted putative class members in a

**meaningful way** from using waiting time effectively for their own purposes.  Indeed, at

the very least, the van policy alone would restrict employees from doing anything

outside of walking distance of the van.  At the "Notice" stage, the Court is not permitted

---

[9] Rather, defense counsel made these objections when Mr. Shank was asked the following questions: (1) if there was a chief financial officer at Averus (Doc. # 69-1 at 11:8-21); (2) whether Mr. Shank was "aware that the named plaintiff in this case filed an unemployment insurance claim against Averus, Inc."; (*id.* at 13:6-17); (3) whether Averus Inc. engages in three main categories of business (i.e., fire exchange, fire protection, and kitchen exhaust cleaning) (*id.* at 14:16-25, 15:1-2); (4) at what time of day Averus' branch managers "generally work during a 24-hour period" (*id.* at 17:19-25); (5) whether "[a]t each of the branches were drivers and helpers generally assigned a van or a work vehicle or a work truck" (*id.* at 18:24-25, 19:1-8); (6) what a "typical day looks like for a driver and helper at Averus" and the "hours drivers and helpers work" (*id.* at 21: 4-15, 20-22, 22:14-17); (7) whether all of Averus' GPS tracking systems were run using the NexTraq system (*id.* at 28: 8-14); (8) whether a quote from the purported CFO of Averus regarding their use of GPS tracking for payroll purposes was accurate (*id.* at 35:1-18); (9) whether "any branch managers ever instructed drivers to pick up helpers" (*id.* at 52:19-25); and (10) how often branch managers use their own knowledge about drive times for purposes of payroll record keeping, as opposed to the times reported by employees (*id.* at 56:23-25, 57:1-3).  Accordingly, the Court takes – at face value – Mr. Shank's testimony regarding Averus' wait time policies.

to look at the merits of the underlying claims, *see Smith v. Pizza Hut, Inc.*, 2012 WL 1414325 at *3, and rather, looks to whether Plaintiff has made "substantial allegations" of a common policy – in this case, a policy which was sufficiently restrictive of employees' time while waiting at customer sites.  Plaintiff has decidedly met this burden. Thus, the Court also concludes that issuing notice to class members at Averus' national locations on the basis of this wait time policy is also proper.  See *Hoffman–La Roche Inc. v. Sperling*, 493 U.S. 164, 170-71 (1989) (If the district court "conditionally certifies" the class during the first stage of the two-stage process, putative class members are provided with court-approved notice and the opportunity to opt in to the action, and the matter proceeds as a representative action throughout discovery).

### D.  Application: Averus' National "Commute" Policy

In 1947, the FLSA was amended by the so-called Portal–to–Portal Act, 29 U.S.C. §§ 251–262.  Under the Portal–to–Portal Act, employers need not compensate employees for ordinary home-to-work commuting, i.e., "walking, riding or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform," nor must they compensate employees for "activities which are preliminary to or postliminary to said principal activity or activities," if such traveling or activities "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, [his or her] principal activity or activities."  29 U.S.C. § 254(a); *see also* 29 C.F.R. § 785.35 (emphasis added) ("An employee who travels from home before his regular workday and returns to his home at the end of the workday is

engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites.  Normal travel from home to work is not worktime.").  The Portal–to–Portal Act was amended by the Employee Commuting Flexibility Act (ECFA) of 1996, to clarify that otherwise non-compensable commuting to and from work is not compensable merely because the employee uses an employer's vehicle for that commute, so long as the travel occurs "within **the normal commuting area for the employer's business or establishment** and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee."  29 U.S.C. § 254(a) (emphasis added).

However, the FLSA also provides several exceptions for time spent commuting to work, one of which Plaintiff contends is relevant here – namely, any travel time that is "part of [an employee's] principal activity" constitutes compensable "hours worked."  29 C.F.R. § 785.38; *see also Steiner v. Mitchell,* 350 U.S. 247, 256 (1956) ("activities performed either before or after the regular work shift . . . are compensable . . . **if those activities are an integral and indispensable part of the principal activities for which [the employees] are employed**"); *Baker v. Barnard Constr. Co.,* 146 F.3d 1214, 1216 (10th Cir. 1998) (same).  In *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513 (2014), the United States Supreme Court clarified that "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an **intrinsic element of those activities** and **one with which the employee cannot dispense if he is to perform his principal activities**."  *Id.* at 517 (emphasis added);

22

*see also Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1290 (10th Cir. 2006)

(quoting *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir. 1976) ("Generally

speaking, an activity is integral and indispensable to the principal activities only if 'such

work is necessary to the [employer's] business and . . . performed by the employees . . .

in the ordinary course of that business'"); *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401

(5th Cir. 1976) (determining whether a particular activity is an "integral and

indispensable part" of a "principal activity" of employment is not a question of "whether

the activities . . . are uniquely related to the predominant activity of the business, but

whether they are performed as part of the regular work of the employees in the ordinary

course of business. It is thus irrelevant whether fueling and unloading trucks is 'directly

related' to the business of electrical wiring; what is important is that such work is

necessary to the business and is performed by the employees, primarily for the benefit

of the employer, in the ordinary course of that business.") Applying these standards,

courts have required compensation under the FLSA for home-to-work commuting that is

"integral and indispensable" to an employee's principal activities, but they have not

required compensation for "normal" home-to-work travel. *See D A & S Oil Well

Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir. 1958) (noting that when travel is

"solely for the transportation of employees to and from their principal place of work, then

. . . the drivers are 'riding, or traveling' within the exclusion of Section 4 of the [Portal-to-

Portal] Act").

    "Whether an activity is preliminary or postliminary to principal activities for

purposes of [29 U.S.C. §] 254(a)(2) of the Portal–to–Portal Act is a mixed question of

law and fact because the precise nature of the employee's duties is a question of fact, while application of the FLSA to those duties is a question of law." *Baker,* 146 F.3d at 1216; *see also United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1116–17 (10th Cir. 1999) ("Each case turns on the particular facts and circumstances involved"); *Mitchell*, 262 F.2d 552 (10th Cir. 1958) (emphasizing that "[i]t is, of course, difficult to fix a definite standard for determining what activities of an employee, performed before and after his hours of work, are an integral part of and indispensable to his principal activities," and therefore, each case involving compensation for travel time "must be decided upon its peculiar facts").

In *Mitchell*, oil rig employees brought an FLSA suit after their employer failed to compensate them for the time they spent commuting when returning from servicing oil well sites (the employees were already paid for the time they spent traveling to the oil fields). *Mitchell*, 262 F.2d at 554. These employees transported the heavy and specialized equipment they needed to do their work in both semi-trucks and pickup trucks, including

> pulling and swabbing units and tanks containing butane gas which is used as fuel for the units while in use at the well sites. The units, weighing 30,000 pounds or more, are mounted on the beds of large trucks. The butane gas tanks of 109 gallon capacity are mounted on pickup trucks. The pickups also, at times, transport other equipment to and from the filed [sic] which could be economically transported otherwise.

262 F.2d at 553. The Tenth Circuit held that the employees' return travel time spent in these heavily-equipped trucks was compensable, explaining:

> It is true . . . that driving a truck is a totally different type of activity from that performed by such driver-employee at the well site. **But employees who transport equipment without which well servicing could not be**

24

> **done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities**.  As to the drivers of the pickup trucks, it is quite clear from the record that they are also transporting equipment without which the principal activities could not be performed.

262 F.2d at 555 (emphasis added).  Similarly, in *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345 (10th Cir. 1986), the Tenth Circuit examined the FLSA overtime case of an oil drilling mechanic, who was responsible for the routine maintenance and emergency repairs of the employer's drilling equipment, and who was provided with a company truck "equipped with a tool carrier and a mobile telephone to travel to [oil drilling] sites."  *Id.* at 1346.  Citing its holding in *Mitchell*, the Court held that the time the mechanic spent traveling to and from oil drill sites was an "integral and indispensable" part of his job and accordingly compensable, because he was traveling in his "specially equipped truck containing many of the tools that he needed to service drilling rigs scattered across several states."  *Id.*

Courts have applied this precedent to find that travel time involving heavy machines and necessary equipment was compensable.  For example, in *McLaughlin v. Somnograph, Inc.*, No. CIV.A. 04-1274-MLB, 2005 WL 3489507, at *6 (D. Kan. Dec. 21, 2005), employees who worked as "sleep technicians" were required to transport large sleep study machines to patients at various medical facilities and to monitor those patients using the machines.  Citing the holdings in *Crenshaw* and *Mitchell*, the district court held that the employee's travel time spent with the sleep machines was compensable, because the employees "were required to transport the machines to all

facilities . . .[and] [t]he machines transported by claimants were indispensable in performing their jobs."  *Id.* at 6.

With the stipulated exception of the Gurnee location,[10] (Doc. # 70-1 at 62:20-25, 63:1-11), Plaintiff argues that Averus had an unlawful policy with regard to the compensability of the time Drivers and Helpers spent traveling to their first service call of the day and traveling home from their last service call.  Specifically, employees are compensated for this travel time only if it exceeds one hour, and only to the extent by which it exceeds one hour.  (Doc. # 70-1 at 54:21-25, 55:1-8.)  Additionally, Mr. Avendano alleges that

> The van I drove while working for Averus was **specially designed with equipment necessary for cleaning the grease** out of kitchen hoods and vents.  There were only two seats – one for the driver and one for the Helper – in front of the van.  Behind the two seats, there were two large pieces of equipment permanently bolted into the van.  One of the pieces of equipment was a large diesel heater and the other was a large water pump.  The equipment never left the van when we arrived at a customer location.  At the customer locations, we would attach hoses to this equipment and then run the hoses to kitchens and rooftops where we would spray the areas that need [sic] to be cleaned with hot, pressureized cleaning fluid.

---

[10] The parties stipulated to the undisputed fact that in Gurnee, Illinois, Averus' employees do not drive their Averus-issued vans home; instead, they report to work at the Gurnee branch at the beginning of their shift, at which point they begin driving an Averus van.   (Doc. # 70-1 at 62:2-25; 63:1-2).  Mr. Shank testified as follows regarding Gurnee's policy for compensating travel time:

> Q: [W]hat was the company policy as far as how drivers and helpers were compensated in Gurnee? So at what point did the drivers and helpers begin getting paid?
> A: My understanding is as soon as they got in the van, or reported, to the time they got back [to the branch].  The full -- everything was compensated.

(*Id.* at 63:4-11.)  Accordingly, the class certified herein as to an unlawful policy regarding the compensability of commuting time **does not include employees in Averus' Gurnee location.**

(Doc. # 41-1 at 2, ¶ 4) (emphasis added).   Plaintiff argues that the vans – which were

equipped with heavy-duty, professional cleaning equipment – were akin to the specially-

equipped trucks in *DA & S Oil Well Servicing, Inc.* and *Crenshaw*.   Accordingly, he

contends that Drivers and Helpers should have been compensated for this hour of travel

time, as it was "an integral and indispensable part of [the employees'] principal

activities," because the employees could not perform their principal activities (i.e.,

cleaning commercial ovens with pressurized, heated cleaning fluid) without the

equipment in the vans.   *See Crenshaw*, 798 F.2d at 1350.

At his 30(b)(6) deposition, Mr. Shank testified as follows regarding Averus' policy

regarding the compensability of travel time at the beginning and the end of the

employee's day:

> **[C]ompany policy is that [Drivers and Helpers] get paid one hour
> after they leave and lose one hour back.**  So basically if you -- . . .  your
> workday starts when you are an hour away from your start point, which
> would either be your house or your pickup point of meeting with your
> helper.  Your day starts then.   And let's say -- you live here [in Denver].
> Let's say you have to drive to Cheyenne.  **It takes an hour and 20
> minutes to get there.  You will get paid 20 minutes.  Because it's an
> hour away, we don't pay the hour there.**  You perform all your work.  **On
> the way back it takes an hour and 20 minutes, you get paid 20
> minutes back.**[11]

(Doc. # 70-1 at 54:21-25, 55:1-8) (emphasis added).  Mr. Shank also testified that the

same policy applied regardless of whether the employees were going on a so-called

"day trip" (where they could finish their entire shift and return home over the course of

---

[11] Elsewhere in the deposition, Mr. Shank testified that, per Averus policy, employees were paid
for the time they spent driving **between** job locations after they arrived at their first job.  (Doc. #
70-1 at 65:16-20.)  Accordingly, from the full context of the deposition, it is clear that when Mr.
Shank is referring to the "way back," he is referring to the employee's trip home.

approximately 10 hours) or an "overnight" trip (typically spent driving to another state).

(*Id.* at 57:7-21).  Additionally, Nicole Stewart, Vice-President of Averus, who Averus

disclosed as an individual with knowledge about "Averus' time keeping and travel time

policies, how Averus calculates hours worked by Lead Service Technicians and Service

Technicians, . . . and Averus' compliance with state and federal wage and hour laws"

(Doc. # 76-5 at 8), provided a declaration that was attached to Averus' opposition to

Plaintiff's prior motion for class certification.  (Doc. # 34-1.)  Ms. Stewart stated in

relevant part as follows:

> Most Lead Service Technicians who drive an Averus-owned truck from
> their home to customer sites (except the Gurnee branch), **are paid for all
> travel time from their home to the first customer site that is in excess
> of one hour, and all travel time from the last customer site to their
> home that is in excess of one hour**. . . . **The only time the Lead
> Service Technicians are not paid is normal home-to-work time (up to
> one hour)** and any breaks that are thirty-minutes or longer.

(*Id.* at 3-4.)

Defendant's Response Brief in opposition to the instant Motion does not dispute

that the above testimony correctly describes Averus' national policy with respect to

travel time (with the stipulated exception of the Gurnee branch); it simply characterizes

the time spent traveling up to one hour in the Averus-issued van at the beginning and

the end of the work day as non-compensable "normal home-to-work commute time."

(Doc. # 77 at 3.)  However, because Defendant's brief focused more on the procedural

reasons for denying the instant Motion, the Court also examined Defendant's Surreply

in opposition to Plaintiff's first Motion for Class Certification, which – in addition to

arguing that Plaintiff had failed to establish that there was a nationwide practice

regarding travel time – also makes arguments about how Averus' policy was not unlawful under the FLSA.  Specifically, Averus argues that the "van Plaintiff alleges was different than a normal commuting vehicle . . . does not impose a substantially greater difficulty to drive than a normal vehicle."  (Doc. # 45 at 3.)[12]  Defendant also attached photographs of the typical Averus van; these photographs show the exterior of the van and the front passenger compartment, but do not show the equipment in the back.  (Doc. # 45-1.)  Defendant also attempts to distinguish *Crenshaw* on the basis that the "primary issue [in that case] . . . was whether the compensation arrangement was proper (i.e., a *Belo* contract)," and because the Tenth Circuit "conducted little analysis or discussion of the type of truck or tools involved."  (Doc. # 45 at 3.)[13]  Finally, Averus

---

[12] Defendant may have cited and applied this standard, rather than the "integral and indispensable" standard set out in, for example, *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1290 (10th Cir. 2006), because it also cited to an opinion letter issued by the United States Department of Labor, which explained that, with regard to the EFCA, commute time is not compensable if it occurs in a vehicle that

> is of a type that does not impose 'substantially greater difficulties to operate than the type of vehicle which would normally be used for commuting.'  For example, an automobile, a pick-up truck, **a van or a mini-van would not normally involve substantially greater difficulties to operate, even if modified to carry tools or equipment, including having no passenger seats**. The fact that a vehicle displays permanently-affixed decals or other advertising does not change the analysis.  **On the other hand, we would consider the following types of vehicles, by their very nature, to involve substantially greater difficulties to operate than a vehicle normally used for commuting**: '18-wheelers,' truck-mounted cranes, truck-mounted drilling rigs, concrete trucks, and **trucks equipped to haul other heavy equipment.**

(Doc. # 45 at 2-3) (emphasis added) (citing FLSA 2001–11, April 18, 2001) (available at https://www.dol.gov/whd/opinion/FLSA/2001/2001_04_18_11_FLSA.htm (last visited 9/12/2016)).

[13] Averus also attempts to distinguish *Crenshaw* because it was decided before the passage of the ECFA.  However, although the Tenth Circuit ruled against the plaintiff-employees in *Smith v. Aztec*, 462 F. 3d 1274 (10th Cir. 2006), it specifically reaffirmed the *Crenshaw* holding **after the**

also pointed to a variety of cases in which Courts outside the Tenth Circuit have held

that "ordinary" home-to-work commuting time in employer-provided vehicles was not

compensable; however, none of the cases it cites pertain to employer-provided vehicles

with extremely heavy-duty, professional tools that are indispensable for the employee's

job performance, like the vans involved herein.[14]

As the Tenth Circuit has noted, it is "difficult to fix a definite standard for

determining what activities of an employee, performed before and after his hours of

work, are an integral part of and indispensable to his principal activities.  Each case

must be decided upon its particular facts."  *D A & S,* 262 F.2d at 554-55.  Nevertheless,

as with Averus' wait time policy, the Court concludes that Plaintiff has met its burden to

---

passage of the EFCA.  *Id.* at 1285-90; *see also Burton v. Hillsborough Cty., Fla.,* 181 F. App'x 829, 835 (11th Cir. 2006) (unpublished, internal quotation omitted) ("under the ECFA 'otherwise non-compensable [traveling] is not compensable merely because the employee uses his employer's vehicle.'  Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle.")

[14] In *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1053 (9th Cir. 2010), the Ninth Circuit rejected a car alarm technician's argument that the time he spent commuting to his first and last client were compensable merely because he used an employer-provided van and had restrictions regarding where he could drive that van.  The opinion does not describe the van's equipment/tools in any sort of detail, and notes only that the employee had a "portable data terminal" in his van. Similarly, in *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 403 (5th Cir. 2011) (unpublished), employees were in-home service technicians who used company-owned vans to make service calls and were not paid for the first and last 35 minutes of their commute to and from work.  The Fifth Circuit held that this commute time was not compensable, but the opinion noted only that the van had some tools in it, as well as a laptop computer provided by Sears to the technicians.  Finally, in *Colella v. City of New York*, 986 F. Supp. 2d 320, 331 (S.D.N.Y. 2013), electricians for the New York City Fire Department (FDNY) brought an unsuccessful wage claim for the time they spent commuting in FDNY-issued pickup trucks, which they used to transport tools of their trade; these tools, however, seem rather different in kind than the permanent tools attached in Averus' van, and included "oil lubricant, battery acid, contact cleaners, paint, certain flammable gasses, a hydraulic bender. . . and various piping equipment," "table and chop saws, power drills, nail guns, a compressor, ladders, flammable gas cans, scaffolding, cement, lumber, and Plexiglas," and "a five gallon tank of gasoline, muriatic acid, cement, bags of stone and sand, and hand tools."  *Id.* at 328, 331.

proffer "substantial allegations" that (1) Drivers and Helpers were not compensated for the time they spent commuting from home to their first customer, nor were they compensated for the time they spent traveling from their last customer back home, unless (and only to the extent that) this time exceeded one hour; and (2) that the vans employees drove contained heavy, professional equipment, and that this equipment was "indispensable and integral" to the employees' principal activity of cleaning commercial and restaurant ovens. *See Baker v. Barnard Const. Co.*, 146 F.3d 1214, 1218–19 (10th Cir. 1998) ("We leave the parties' contentions regarding the integral and indispensable nature of the return travel to be resolved by the jury . . . The jury will consider whether Plaintiffs could have left the rigs at the work site to be refueled and maintained on site, or whether Plaintiffs were required, by policy or practical reality, to transport the rigs from the work site each day to refuel and restock.  In making its determination of whether the travel associated with refueling and restocking the rigs is integral and indispensable, the jury will consider and evaluate the parties' contradictory testimony and evidence.").  As such, the Court also concludes that issuing notice to class members at Averus' national locations on the basis of this travel time policy (with the stipulated exception of the Gurnee location) is proper. *See Hoffman–La Roche Inc.,* 493 U.S. at 170-71.

## E.  Plaintiff's Proposed Class Notice

"Under the FLSA, the Court has the power and duty to ensure that the notice is fair and accurate, but it should not alter Plaintiff's proposed notice unless such alteration is necessary." *Pizza Hut, Inc.*, 2012 WL 1414325, at *7.  Defendant's Response to the

instant Motion does not indicate whether it is in agreement with the language in Plaintiff's proposed notice.  Nevertheless, the Court will allow Defendant an opportunity to meet and confer with Plaintiff's counsel to ensure that the proposed notice is accurate and complete.

### III.  CONCLUSION

For the reasons stated above, Plaintiff's Motion for Conditional Certification of a Nationwide FLSA Class Under Section 216(b) of the Fair Labor Standards Act (Doc. # 70) is HEREBY GRANTED, and the Court conditionally certifies a national class, defined as follows:

> ALL PEOPLE CURRENTLY OR FORMERLY EMPLOYED BY AVERUS AS SERVICE TECHNICIANS OR LEAD SERVICE TECHNICIANS IN AVERUS'S KITCHEN EXHAUST CLEANING DIVISION.

It is further

ORDERED that the parties shall meet and confer and submit, within fourteen days of this order, a joint proposed Notice.  If the parties cannot agree on joint language, the parties are ordered to submit, simultaneously and within fourteen days of the date of this order, their respective proposed notice with a brief explaining the scope of their disagreement and the legal support for their respective proposed language.  The parties are encouraged to reach an agreement without the Court's intervention.

DATED: September 29, 2016

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge