IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 14-cv-01614-CMA-MJW

ALFONSO AVENDANO, on behalf of himself and others similarly situated,

    Plaintiff,

v.

AVERUS, INC., and
MICHAEL SHANK,

    Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY FOR PLAINTIFF'S WAIT-TIME CLAIMS UNDER THE FAIR LABOR STANDARDS ACT**

---

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on Liability for Plaintiff's Wait-Time Claims Under the Fair Labor Standards Act. (Doc. # 71.) For the reasons provided below, the Court grants the instant Motion.

## I. BACKGROUND AND PROCEDURAL HISTORY

Defendant Averus Inc. (Averus) provides maintenance and fire protection services to restaurants, bars, and hotels in several states, including kitchen exhaust and oven cleaning services. (Doc. # 34-1 at ¶ 5.)

Plaintiff, Alfonso Avendano, was a non-exempt employee and worked as a "Lead Service Technician" ("Driver") for the Denver branch of Averus. Throughout his tenure with Averus, Plaintiff drove with a "Service Technician" ("Helper") in his employer-issued

van. (Doc. # 41-1 at 3.) The van was outfitted with professional cleaning equipment and cleaning supplies – specifically, a large diesel heater and water pump bolted in the back, immediately behind the front seats. (Doc. # 34-1 at ¶ 4.) Mr. Avendano and his Helper would drive this van to an Averus client's location, attach hoses to the van's equipment, and use the hoses to spray heated, pressurized cleaning fluid onto oven hood and vent exhaust systems at restaurants and other job sites. (*Id.*) Mr. Avendano was paid $10.00 an hour. (*Id.* at ¶ 5.) Because Averus' customers were restaurants and other customer facilities, the Drivers and Helpers generally did their cleaning work throughout the night and early morning, when those restaurants and other customer facilities were closed to the public; additionally, Mr. Avendano's work often occurred in suburban and rural locations in Colorado, and also in out-of-state locations, such as Nebraska, Wyoming, and South Dakota. (Doc. # 71-1 at 17:14-18; 34-1 at ¶¶ 19 & 26.) Mr. Avendano was directly supervised by Michael Shank, then-Branch Manager of Averus' Denver location. (Doc. # 34-1 at ¶ 5.) Mr. Avendano alleges that

> **Frequently, I would have to wait at the customer site before cleaning because the customer was not ready for me to clean. This waiting time was often one or two hours or more.**
>
> **I did not think of the time waiting at restaurants to be break time. I was not allowed to leave the customer site or use this time for my own personal purposes,** and because I knew that I would have to arrive at the next restaurant site on time, **I often used this time to prepare my equipment. During the entire time I worked for Averus, I was not paid for all of the time that I spent waiting at restaurants to clean their kitchen exhaust hoods.**

(Pl's App'x at 49, ¶¶ 8–11) (emphasis added). Additionally, Mr. Avendano alleges that "There was no flexibility built into the assignments. If a restaurant manager told me and

2

the other crewmember to wait for a period of time before beginning work because he was not ready, we would not be compensated for this time." (*Id.* at 2, ¶ 11.)

On March 31, 2015, the Court granted in part and denied in part Plaintiff's Motion to certify a collective action under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b). (Doc. # 51.) The Court concluded that Plaintiff had proffered "substantial allegations" that Drivers and Helpers who worked in Averus' Denver location and who were supervised by Michael Shank had been exposed to common, company-wide policies with respect to the failure to pay minimum wages and overtime. (*Id.* at 15.)

On September 29, 2016, the Court granted Plaintiff's second Motion for Class Certification under Section 216(b) of the FLSA, and held that Plaintiff had also made "substantial allegations" that Averus did, in fact, have a national policy whereby employees who were waiting at customer sites were not "completely relieved from duty" for periods that were "long enough to enable [the employees] to use the time effectively for [their] own purposes." (Doc. # 91 at 20) (citing 29 C.F.R. §§ 785.15, 785.16, 785.17).

The instant Motion seeks to establish liability on one of Plaintiff's **individual** claims – namely, "Defendants' failure to pay [Mr. Avendano] for all of the time he spent waiting at customer sites, in the middle of the night, before he could begin a cleaning job." (Doc. # 71 at 2.)

Averus did not file a Response opposing the instant Motion; instead, it filed a Motion to Stay Briefing on the instant Motion. (Doc. # 75.)

## II. ANALYSIS

### A. Summary Judgment Standard

The purpose of a summary judgment motion is to assess whether trial in a particular case (or on a particular claim or issue) is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party. *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, the movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Federal Rule of Civil Procedure 56(e) specifically contemplates the consequences of failing to oppose a summary judgment motion:[1]

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial. **If the party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.**

*See also Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) (emphasis added) (citing Fed. R.Civ. P. 56(e) and noting "[A] party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. **The district court must make the additional determination that judgment for the moving party is 'appropriate' under Rule 56. Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law**.")

---

[1] The Court recognizes that Defendants did not entirely fail to respond to this Motion; nevertheless, in choosing to file a Motion to Stay Briefing rather than a specific response, Defendants took a risk that the Court would deny their Motion for a Stay and decide this Motion on the merits. *See* D.C.COLO.LCivR 7.1(d) (noting that the Court may rule on a motion "at any time after it is filed.") Accordingly, the Court utilizes the summary judgment standard that applies when a party fails to file a response in opposition, but notes that there are no factual disputes, as the Court is relying on Defendants' own 30(b)(6) deposition.

However, if a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial on a particular issue. *See Celotex*, 477 U.S. at 323.

### B. Application

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which is "to suffer or permit to work"; however, the statute does not define "work." 29 U.S.C. § 203(g). *See* 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.' The act, however, contains no definition of 'work.'"). Nevertheless, it is well-settled that time employees spend waiting, on standby, or on-call may be, under certain circumstances, compensable "work" time under the FLSA, and that an employee who is "engaged to wait" must be compensated, even though an employee "wait[ing] to be engaged" need not. See *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("Of course an employer . . . may hire a man to do nothing, or to do nothing but wait for something to happen. . . . Readiness to serve may be hired, quite as much as service itself.").

"[T]he test for whether an employee's time constitutes working time is whether the 'time is spent predominantly for the employer's benefit or for the employee's.'" *Gilligan v. City of Emporia, Kan.*, 986 F.2d 410, 412 (10th Cir. 1993) (citing *Boehm v. Kan. City Power & Light Co.*, 868 F.2d 1182, 1185 (10th Cir. 1989)). The Tenth Circuit has explained that this determination of whether an employee was "engaged to wait" or merely "waiting to be engaged" requires the "'consideration of the agreement between

the parties, the nature and extent of the restrictions, the relationship between the services rendered and the on-call time, and all surrounding circumstances,'" as well as "the degree to which the burden on the employee interferes with his or her personal pursuits." *Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1132 (10th Cir. 2000) (quoting *Boehm*, 868 F.2d at 1185); *see also Renfro v. City of Emporia*, 948 F.2d 1529, 1537 (10th Cir. 1991) (internal quotation omitted) ("[R]esolution [of whether time was working time]. . . involve[s] determining the degree to which the employee could engage in personal activity while subject to being called."). Although the inquiry is "highly individualized and fact-based" – *see Pabst*, 228 F.3d at 1132 – it is possible to resolve the question of the compensability of "waiting" time as a matter of law at the summary judgment stage. *Sarmiento v. City & Cty. of Denver,* 82 F.3d 426 (10th Cir. 1996).

Department of Labor regulations also "lend insight into the determination of what constitutes compensable time." *Gilligan*, 986 F.2d at 412. In particular, the regulations provide that

> Periods during which an employee is **completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. An employee is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he [or she] may leave the job and that he will not have to commence work until a definitely specified hour has arrived.** Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case.

29 C.F.R. § 785.16 (emphasis added). Additionally, if an employee is required to remain on the employer's premises "or so close thereto that he [or she] cannot use the time effectively for his own purposes," he or she is "on call" and must be compensated,

7

whereas "[a]n employee who is not required to remain on the employer's premises but is merely required to leave word at his [or her] home or with company officials where he [or she] may be reached is not working while on call" is not required to be compensated. 29 C.F.R. § 785.17.  The Department of Labor also provides the following helpful examples applying the FLSA regulations:

> A stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity.  **The rule also applies to employees who work away from the plant**.  <u>For example, a repair man is working while he waits for his employer's customer to get the premises in readiness.  The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity</u>.  **The periods during which these occur are unpredictable.  They are usually of short duration.  In either event <u>the employee is unable to use the time effectively for his own purposes.</u>  It belongs to and is controlled by the employer.  In all of these cases waiting is an integral part of the job. The employee is engaged to wait.**

29 C.F.R. § 785.15 (emphasis added).

Mr. Shank was Averus' 30(b)(6) designee, and Averus specifically represented that he was knowledgeable about "how Averus calculates hours worked by Lead Service Technicians and Service Technicians, . . . and Averus' compliance with state and federal wage and hour laws." (Doc. # 76-5 at 9.)  At his 30(b)(6) deposition, Mr. Shank testified as follows regarding Averus' policy regarding the use of Averus' work vans:

> **Q:** So I'm assuming that Averus has some policies about they've [sic] given vans to these drivers and driver/helper teams, they keep them at their homes -- well, at the driver's home, generally, I would think?

8

> **A:** Right.
> **Q:** And I'm assuming they're not allowed to use the van for whatever they want?
> **A:** Correct.
> **Q:** So what can they and can't they use the van for?
> **A:** **They are instructed to use the van per company policy to go to and from work, in between jobs, to the warehouse and/or storage unit, and directly home. They are not to use it [sic] anything outside of that scope.**
> **Q:** So if, say, Mr. Avendano was, hypothetically, cleaning a hood at a restaurant in Boulder and his next job was in Longmont, but there were three hours between the Boulder job and the Longmont job, could he drive home in between and drive back to the Longmont job?
> **A:** Could he? Yes.
> **Q:** That would be permitted by Averus policy?
> **A:** <u>**No. Not by policy. He could. It's up to him to do it. By our policy, they are to go from point A to point B, per job assignment, and take the time to get there.**</u>

(Doc. # 70-1 at 24:8-25, 25:1-9.) (emphasis added).

Averus' lawyer followed up with the following questions regarding the compensability of the time employees spent waiting at customer sites, and what employees were permitted to do while they were waiting:

> **Q:** But outside of that compensable travel time [from one client location to another], **if there was an additional gap of time of greater than 30 minutes[2] – I think the example that was given was two or three hours, that time – would that time be compensated?**
> **A:** No.
> **Q:** And during that time, what was the company's policy as to what drivers and helpers were able to do during that two- or three-hour gap time?
> **A:** <u>**That was considered free time for the employee. Non-work time.**</u> **They could go shopping. As long as they didn't put the company vehicle or the company at risk.**
> **Q:** So could they sleep in their vans?
> **A:** Oh, yes.

---

[2] Employees are paid for the first 30 minutes of their wait time. (Doc. # 70-1 at 55.)

> **Q:** Were you aware of employees doing that?
> **A:** Absolutely.
> **Q:** Could they eat?
> **A:** Yes.
> **Q:** Could they read?
> **A:** Yes.
> **Q:** Could they go home?
> **A:** Yes.

(Doc. # 69-1 at 65:21-25, 66:1-25, 67:1-7) (emphasis added).

When Plaintiff's attorney asked for clarification about what Drivers and Helpers were, in fact, permitted to do while waiting, Mr. Shank testified as follows:

> **Q:** [B]ack to the Boulder/Longmont example. When we discussed that earlier, I asked you specifically whether or not during the two- or three-hour gap the drivers and helpers could go home and you said no. Your attorney just asked you whether or not the drivers and helpers could go home during this hypothetical two-hour gap and you said yes. So I'm confused. Which is it, yes or no?
> **A:** **If you're using the word "could go home," yeah, they could go home. <u>Was it company policy? No. But they could do whatever they want. It's very frowned upon, meaning it's a waste of company resources.</u>**
> **Q:** **Right. So, I mean, the way you explained it before is that they could go home, just like a meteor could hit me right now.**
> **A:** **Well, yeah.**
> **Q:** But that it was against company policy for them to go home because they **would burn a bunch of gas**?
> **A:** **Right. Sorry. Yes. Correct. . . .**
> **Q:** So yes?
> **A:** Yes.
> **Q:** Thank you. Because, theoretically, an employee could do anything at any given moment, but that doesn't mean that that thing they do isn't violating company policy, correct?
> **A:** Correct.

(*Id.* at 67:24-25, 68:1-25, 69:1-2) (emphasis added).

Averus' attorney also asked Mr. Shank the following questions about Averus' disciplinary policies if an employee went home while waiting at a customer site:

> **Q:** Within a normal commuting distance, okay, if an employee had a large gap of time -- you know, I understand -- I understand that if the employee had a gap of time in Cheyenne it would be a problem to drive back home to Aurora, let's say. But let's say it's not an over-the-road, over-the-night trip, or outside of what would be the normal, regular service area, okay, and an employee had a large gap of time, **would they be disciplined for going home and -- during that gap of time?**
> **A:** **Yes. In the form of a conversation. Yeah, we would highly recommend that they don't do it. And if it became a problem, then it would be a written warning.**
> **Q:** Have you ever disciplined anyone for that?
> **A:** No.
> **Q:** **Are you aware when you were a branch manager that employees did go home during this gap time?**
> **A:** Yes.
> **Q:** **And did you discipline them for it?**
> **A:** Yes.

(*Id.* at 70:13-25, 71:1-9) (emphasis added).

In opposition to Plaintiff's second Motion for Class Certification under Section 216(b) of the FLSA, Defendants did not dispute that Mr. Avendano was not paid for the time he spent waiting for customers if it exceeded 30 minutes; it simply characterized this uncompensated waiting time as "free time" in which employees were completely off-duty and could do as they wished. *See* Doc. #77 at 5 (emphasis added) ("[Mr.] Shank testified that Averus' nationwide policy was that employees **were free to spend their time during breaks** of more than thirty minutes (Plaintiff refers to this as "wait time") **to engage in personal activities, including shopping, sleeping, eating, and reading.**"); *see also* Pl's App'x 42 (Declaration of Nicole Stewart, Vice-President of Averus) ("The only time [Drivers] are not paid is . . . **any breaks** that are thirty-minutes or longer.")

11

However, Mr. Shank's own testimony, quoted above, establishes that far from allowing employees to use their waiting time effectively for their personal activities, Averus's policies so restricted Mr. Avendano's freedom that he was, as a matter of law, "engaged to wait." Averus' van policy permitted Drivers and Helpers "to use the van . . . to go to and from work, in between jobs, to the warehouse and/or storage unit, and directly home. **They are not to use it [sic] anything outside of that scope.**" (Doc. # 69-1 at 24:8-25.) Mr. Shank also testified that Mr. Avendano was **specifically prohibited from going home** while waiting for a customer to become ready, and that if he did so, he would be disciplined. Indeed, this possibility of discipline was very real, as Mr. Shank himself had disciplined employees in the past for going home while waiting for customers. Accordingly, once Mr. Avendano arrived at a job site, while he was waiting for a customer to be ready, he was effectively "stuck" in the van, or within very close proximity (i.e., walking distance) of the van/customer location.

Moreover, the Court is not persuaded that the very limited number of "personal activities" in which Mr. Avendano could engage in the middle of the night while waiting for customers– i.e., sleeping in his employer's van, eating a meal in that van, reading in that van, or going shopping at a nearby convenience store within walking distance of that van[3] – meant that Mr. Avendano was "completely relieved from duty" and able to use this waiting time "effectively" for his own personal purposes. *See* 29 C.F.R. §

---

[3] Although Mr. Shank testified that employees could "go shopping" while they were waiting for customers, as a matter of logic, because employees were prohibited from using the van to drive anywhere once they arrived at a customer site, it is clear that employees could "go shopping" only to the extent that such shopping occurred at a store that happened to be within walking distance of the van/customer location and one that happened to be open in the middle of the night.

12

785.17 (if an employee is required to remain on the employer's premises "or so close thereto that he [or she] cannot use the time effectively for his own purposes," he or she is "on call" and must be compensated). Moreover, as a matter of common sense, that Mr. Avendano spent such time waiting within very close proximity to the van undoubtedly was to Averus' benefit, as it insured that nothing happened to the vans or equipment. It also allowed Mr. Avendano and his Helper to begin their cleaning work as soon as the customer notified him that it was ready for such work to begin. Additionally, Mr. Shank admitted that limiting the use of the vans in this way reduced the amount of money Averus spent on gas. Finally, although customers would "frequently" require Mr. Avendano to wait for an hour, two hours, or even more, to begin working, sometimes no such waiting was necessary. *See* 29 C.F.R. §§ 785.15, 785.16 (noting that when periods of inactivity are "unpredictable" and "usually of short duration," and the employee "is unable to use the time effectively for his own purposes," then the employee is "engaged to wait" and the inactive time is compensable; in order for an employee to be "completely relieved from duty," he must be "definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived," and must have a break that is "long enough to enable him to use the time effectively for his own purposes").

In sum, the Court concludes that Mr. Avendano's freedom to engage in personal activities was restricted to the extent that the time he spent waiting in or around Averus' employer-issued van was predominantly for Averus' benefit, despite the fact that employees were permitted to engage in a limited number of so-called "personal" activities while waiting, such as reading a book or eating a sandwich in the van. Accordingly, this time was compensable under the FLSA. *See Armour*, 323 U.S. at 133 (holding as compensable "time spent in playing cards and other amusements, or in idleness" while engaged to wait); *Renfro*, 948 F.2d at 1532 (emphasis added) (finding firefighter's on-call time to be compensable because the employees were required to carry pagers and return to work within twenty minutes if called, despite the fact that they were not required to remain at the station premises and many of the firefighters had "participated in sports activities, socialized with friends and relatives, attended business meetings, **gone shopping, gone out to eat**, babysitted, [sic] and performed maintenance or other activities around their home"); *Lassen v. Hoyt Livery, Inc.*, 120 F. Supp. 3d 165, 176 (D. Conn. 2015) (holding that time limousine drivers spent waiting for passengers between assignments was compensable, because the drivers were required to stay in close proximity to their limousine, stay dressed in uniform, be ready to take on an unexpected new assignment in the interim or otherwise risk losing the assignment they were already waiting for, and were not typically permitted to use the limousine for personal use); *Moon v. Kwon*, 248 F.Supp.2d 201, 230 (S.D.N.Y. 2002) (holding that the time maintenance employees spent waiting for assignments, "[e]ven if [plaintiff] did spend some time during the evenings socializing in the [workplace] while

14

waiting for assignments," was compensable); *Donovan v. 75 Truck Stop, Inc.*, No. 80–9–CIV–OC, 1981 WL 2333, at *12, (M.D. Fla. July 20, 1981) (holding that even if truck washers had been permitted "to go across the street to go swimming at the Days Inn, this would not have been sufficient to relieve the employer from his responsibility to compensate them during such periods . . . because the employees were expected to be available to commence work immediately upon arrival of a truck").

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment on Liability for Plaintiff's Wait-Time Claims Under the Fair Labor Standards Act.  (Doc. # 71.)  Additionally, Defendants' Motion to Stay Briefing on the instant Motion is HEREBY DENIED AS MOOT.  (Doc. # 75.)

DATED:  September 29, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge